Filed 2/24/14  P. v. Rodriguez CA

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C069866 |
| Plaintiff and Respondent, | (Super. Ct. No. SF112865A) |
| v. | |
| STEVEN REFUGIO RODRIGUEZ, | |
| Defendant and Appellant. | |

Late one evening officers stopped a vehicle driven by defendant Steven Refugio Rodriguez, who admitted to drinking and sat next to an open container of malt liquor.  A search of the vehicle unearthed a duffle bag containing drugs, a weapon, and ammunition.  An information charged defendant with possession of a firearm by a convicted felon; possession of a sawed-off shotgun; possession of ammunition by a convicted felon; transportation of methamphetamine; and possession of a controlled substance while in possession of a loaded, operable firearm.  (Former Pen. Code, §§ 12021, subd. (a)(1), 12020, subd. (a)(1), 12316, subd. (b)(1); Health & Saf. Code, §§ 11379, 11370.1, subd. (a).)[1]

---

[1]  All further statutory references are to the Penal Code unless otherwise specified.

1

A jury found defendant guilty on all counts, and the court sentenced him to 11 years four months in state prison. Defendant appeals, contending the court erred in denying his motion to suppress, abused its discretion in denying his motion for disclosure of peace officer personnel records, and committed sentencing error. We shall stay defendant's sentence on count 5 pursuant to section 654; in all other respects we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Two officers, James Nance and Kyle Pierce, stopped a vehicle driven by defendant. Inside the vehicle officers found a duffle bag containing a loaded sawed-off shotgun, ammunition, methamphetamine, and a glass pipe. An information charged defendant with possession of a firearm by a convicted felon (count 1), possession of a sawed-off shotgun (count 2), possession of ammunition by a convicted felon (count 3), transportation of methamphetamine (count 4), and possession of a controlled substance while in possession of a loaded, operable firearm (count 5). The information also alleged defendant had previously been convicted of two serious felonies within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b).

A jury trial followed. Defendant represented himself at trial, and the following evidence was introduced.

Late one evening in September 2009 Officers Nance and Pierce noticed a white Monte Carlo stopped on the roadway. As the officers pulled in behind the Monte Carlo, it turned in to a gas station. Officer Nance activated the patrol car's overhead lights as soon as they got behind the Monte Carlo.

Officer Nance saw defendant, the driver, lean forward and then sit back up as the Monte Carlo stopped. Officer Pierce saw defendant "reach with his right shoulder lower, like he was trying to reach for something or push something under the seat."

The officers asked defendant to put his hands out the window, defendant complied, and the officers then approached the Monte Carlo. According to Officer

Nance, defendant's eyes were red and watery, and he smelled of alcohol. When Nance looked into the car, he saw an open container of malt liquor in a brown paper bag next to the center console on the passenger-side floorboard. Nance asked defendant if he had been drinking, and defendant said he had a beer or a beer and a half earlier.

At this point, California Highway Patrol (CHP) Officer John Pabst drove up. Pabst had defendant perform field sobriety tests. Officer Nance used the mobile computer in the patrol car to run the Monte Carlo's license plate. The license plate belonged to a 2000 Plymouth whose registration had expired. Defendant was the registered owner of the Plymouth. Nance also ran the Monte Carlo's VIN (vehicle identification number). The Monte Carlo's registration had expired in June 2006.

Officer Nance asked defendant for his driver's license, vehicle registration, and proof of insurance. Although defendant had a valid driver's license, he did not have registration or insurance for the Monte Carlo.

Officers Timothy Swails and Thomas Heslin assisted Officers Nance and Pierce with the traffic stop. They arrived shortly after Nance and Pierce. Defendant was already outside the car. Swails saw seven other people in the car, both adults and children.

Officer Swails searched the interior of the Monte Carlo and found a black duffle bag on the floor between the driver's and passenger's seats. Inside the bag, Swails found a sawed off, .12 gauge, double-barrel shotgun. The officer took two live shells out of the gun.

The duffle bag also contained a toiletry bag, inside of which were more shotgun shells and a "piece of clear plastic wrapping that was twisted at the top that contained several piece[s] of an off-white crystal substance that [he] recognized to be methamphetamine." Officer Swails also found a "glass drug pipe" that had stains consistent with its having been used to smoke methamphetamine.

3

Officer Pierce collected and booked the items Officer Swails unearthed in the Monte Carlo. According to Pierce there were 21 shotgun shells in the toiletry bag; when added to the two shells from the shotgun, there were 23 shells. The shotgun barrel measured 13-3/4 inches, for an overall length of 21 inches. An analysis of the substance in the clear plastic wrap revealed it contained 0.3 gram of methamphetamine.

Police Sergeant Richard Ridenour, on patrol that night, heard via the radio that several officers were involved in a traffic stop. After Ridenour arrived at the scene he went to speak with Officer Pierce. As the pair spoke, Ridenour heard someone call his name. Ridenour went to the pulled-over vehicle and saw defendant sitting inside it.

Defendant told Sergeant Ridenour his name and asked if the sergeant remembered him. Ridenour replied, " 'No, I don't really remember you.' " Defendant responded: " 'Well, remember from [the] FBI task force.' " Ridenour recalled having arrested defendant "at some point." Fellow officers told Ridenour defendant was stopped because the registration on his car was expired and he had an open alcoholic beverage container in his car.

**Defense**

### *Rosie Rangel*

Rosie Rangel was a passenger in defendant's car the night of the traffic stop. Rangel testified defendant picked her up in a white Monte Carlo. They drove to an apartment building, where they picked up Darlene Orozco and her children.

After defendant picked up Orozco and her children, officers pulled him over. He pulled off the road into a gas station. Rangel testified several patrol cars "were all around us." According to Rangel, eight to 10 officers responded.

After defendant got out of the Monte Carlo, an officer asked Rangel if there was anything illegal in the car. She replied, " 'My beer.' " When the officer asked why this was illegal, Rangel stated, " 'It's open.' " According to Rangel, the officer then said, " 'I'm not gonna go there with you. It's his beer.' " Rangel testified there were two

beers in the car. Rangel sat in the front passenger seat. An officer asked Rangel to get out of the car. After she got out of the car, officers handcuffed her.

Rangel denied seeing the black duffle bag in the Monte Carlo the night of the traffic stop. She testified: "I'm positive. I was sitting right in front." However, Rangel did see Orozco's pink diaper bag in the back seat.

### Darlene Orozco

Darlene Orozco testified that the night of the traffic stop she called defendant and asked for a ride. He picked her up, and after they drove some distance, officers pulled over the car. According to Orozco, there were "a lot" of officers at the stop.

As soon as defendant stopped the car, three officers surrounded it and ordered the occupants out. Orozco sat in the back seat with her five children. She also had a diaper bag with her in the back seat; she left it there when she got out of the car. As she exited the car, officers handcuffed her. Two to four officers searched defendant's car: "It looked like a lot of them were just on top of it." Orozco remained handcuffed for about 20 minutes. She did not know there was a gun or drugs in the car.

### Officer Heslin

Officer Heslin participated in the traffic stop, arriving with his partner, Officer Swails, a few minutes after the stop occurred. The traffic stop was conducted by Stockton Police and a CHP unit. An officer took defendant to a patrol car; defendant was not handcuffed. After the car was empty, Heslin went to the passenger side. As he looked into the front passenger seat, Officer Swails "said there was a gun in the car."

### Officer Pabst

CHP Officer Pabst and his partner also responded to the traffic stop. Pabst conducted a field sobriety test on defendant. He testified defendant had been drinking but was not under the influence of alcohol.

5

Pabst impounded defendant's car "due to the registration being expired and also [he] had been arrested." During the course of inventorying the car's contents, Pabst found in the trunk the license plates that belonged on the Monte Carlo.

### Evidence Technicians

A field evidence technician arrived on the scene of the stop that evening. She took numerous photographs of the items found in the car. Most of the items she photographed were on the trunk of the car.

Another evidence technician processed the shotgun for fingerprints. She did not find any prints. The technician testified that, in her experience, latent prints are obtainable about 10 percent of the time.

### Nancy Rodriguez

Nancy Rodriguez works with ex-offenders in the San Joaquin County Worknet program. Nancy knew defendant for about three years. She and defendant bought the Monte Carlo together in 2009 from a "tow yard." Sometime after the traffic stop, Nancy went to the impound yard to recover the Monte Carlo. After presenting documentation, Nancy retrieved the car and found the glove box was open and the registration and proof of insurance were strewn about.

### Stephanie Rodriguez

Defendant's sister, Stephanie Rodriguez, testified that she spoke with Rangel after defendant's arrest. Rangel said she claimed to be the owner of the shotgun the night of the traffic stop. Later Stephanie tried to get Rangel to come to court to testify she owned the shotgun, but she could not locate Rangel.

After Rangel's trial testimony, Stephanie asked her why she had not admitted owning the shotgun. Rangel told Stephanie, " 'I got scared. I been clean for 15 months, and I have a baby now, and I have to get my life in order.' " Stephanie told Rangel that defendant's life was at stake, but Rangel had nothing else to say. Rangel also told Stephanie that the black duffle bag with the shotgun belonged to her boyfriend.

6

According to Stephanie, she and defendant were staying at a motel on the day of the traffic stop. The only things defendant put into the Monte Carlo that day were Stephanie's belongings, since she was moving from the motel into a house.

**Verdict and Sentencing**

The jury found defendant guilty on all counts. In addition, the jury found the prior conviction allegations true. The trial court granted defendant's request for appointment of counsel. Defense counsel filed a request to have one or more strikes dismissed. The court granted the request and dismissed one of the prior strikes.

The trial court ultimately sentenced defendant to 11 years four months in prison: the upper term of six years (three years, doubled, pursuant to section 667, subdivision (e)(1)) on count 1; plus 16 months (one-third of the middle term pursuant to section 1170.1, subdivision (a), doubled pursuant to section 667, subdivision (e)(1)) on count 3; plus two years (one-third of the middle term pursuant to section 1170.1, subdivision (a), doubled pursuant to section 667, subdivision (e)(1)), to be served consecutively, on count 4; plus two years (one-third of the middle term pursuant to section 1170.1, subdivision (a), doubled pursuant to section 667, subdivision (e)(1)), to be served consecutively, on count 5. The court ordered defendant to serve the middle term of four years (two years, doubled, pursuant to section 667, subdivision (e)(1)) on count 2 but stayed the sentence under section 654. The court also imposed fines and fees. Defendant filed a timely notice of appeal.

**DISCUSSION**

**Motion to Suppress**

Defendant contends the trial court erred in denying his motion to suppress. Defendant argues: "The traffic stop in the instant case was not based on reasonable and articulated suspicions."

**Background**

Defendant moved to suppress evidence. The court held a hearing on the motion.

Officer Pierce testified he and Officer Nance were part of a special operation with the CHP, patrolling different high-crime areas. As they drove down Clover Street, Pierce saw a "white vehicle traveling eastbound in the number two lane of Bianchi [Road]; and there [were] two cars behind it. And the white vehicle was just stopped."

Officer Pierce testified he "looked to [his] left and didn't see any other cars in front of it," and he "found it kind of odd that it stopped in the roadway for no apparent reason." As Pierce sat stopped at a stop sign, the other car "started moving slowly, and it turned into the west side of the Chevron parking lot."

The officers pulled over the car; Officer Pierce approached the passenger side and Officer Nance approached the driver's side. Nance told Pierce he had seen "an open bottle of beer between the driver and the passenger, like on the floorboard in the front seat." Nance also told Pierce that the driver had red, watery eyes. Officers later determined that the license plates on the vehicle belonged on a 2000 Plymouth Breeze registered to defendant.

Officer Swails testified that on the evening of the traffic stop he went to the Chevron station to assist Officers Nance and Pierce "with a traffic stop they had made in the parking lot." Nance directed Swails to search the white Monte Carlo that had been stopped. Swails stated Nance had said that "he found open containers in the vehicle."

Officer Swails' search unearthed the sawed-off shotgun, loaded with two live shells. He found the shotgun inside a black duffle bag in front of the bench seat on the front floorboard of the car. Inside the duffle bag was a toiletry bag, inside of which Swails found "a glass drug smoking pipe and a piece of clear plastic that contained several pieces of off-white crystal-like substance." Swails gave his finds to Officers Pierce and Nance.

Officer Swails interviewed Orozco at the scene. He asked her about the gun in the vehicle. Orozco told Swails that she did not know the gun and drugs were in the car.

8

The trial court denied the motion to suppress. Defendant later moved to set aside the information. He argued the officers seized the evidence in violation of his Fourth Amendment rights. The court denied the motion.

**Discussion**

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific facts that, when considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity. Traffic stops are investigatory detentions for which the officer must be able to provide specific facts justifying the suspicion that a law is being violated. (*People v. Dotson* (2009) 179 Cal.App.4th 1045, 1049 (*Dotson*); *People v. Rogers* (2009) 46 Cal.4th 1136, 1156.)

An officer may stop and detain a motorist on reasonable suspicion that the driver has violated the law. The guiding principle in determining the propriety of an investigatory detention is the reasonableness in all the circumstances of the particular governmental invasion of an individual's person or property. Reasonable suspicion is a less stringent standard than probable cause and can be based on less reliable information than that required for probable cause. However, to be reasonable, an officer's suspicion must be supported by some specific, articulable facts that are reasonably consistent with criminal activity. (*People v. Wells* (2006) 38 Cal.4th 1078, 1082-1083.)

On appeal, when considering a trial court's ruling on a motion to suppress, we defer to the court's express or implied factual findings where they are supported by substantial evidence. However, we exercise our independent judgment in determining whether the search or seizure was reasonable under the Fourth Amendment. (*Dotson*, *supra*, 179 Cal.App.4th at p. 1049.) We are limited to the facts presented at the suppression hearing. (*People v. McKim* (1989) 214 Cal.App.3d 766, 768, fn. 1.)

9

Here, defendant argues the traffic stop was not based on reasonable or articulated suspicions: "Officers Pierce and Nance had no prior information about any purported criminal activity in the area. The officers were not actively searching for a suspect vehicle or a person involved in a crime. The officers stopped [defendant] merely because they thought it was odd that he was stopped without an apparent reason."

In support, defendant cites *People v. Perrusquia* (2007) 150 Cal.App.4th 228 (*Perrusquia*). In *Perrusquia*, police officers were briefed by detectives about a series of armed robberies of 7-Eleven stores in the area. The detectives provided a description of the suspect and requested the officers do patrol checks and keep 7-Eleven stores under observation because of the frequent robberies. Officer Tisdale, based on his experience, knew the area around one of the 7-Eleven stores was a high-crime area. The officer had contacts in the area relating to assault with a deadly weapon and drug complaints. Tisdale also knew that numerous gangs had ties to the area. (*Id*. at pp. 230-231.)

Tisdale entered the 7-Eleven parking lot and noticed the defendant's car. The car was occupied and parked, with the engine running, next to an exit and facing the street. This caught the officer's attention because there were other spots available closer to the 7-Eleven's entrance. Tisdale stood behind the car, watching the defendant, who was crouched low in the driver's seat and leaning against the glass. The officer found this suspicious. After about 45 seconds another officer arrived on scene and the two continued to observe the defendant. The two officers began to approach and as they reached the rear of the car, Tisdale heard " 'kind of like a fumbling.' " He then heard something drop to the floor of the car with a thud. (*Perrusquia*, *supra*, 150 Cal.App.4th at p. 231.)

The defendant glanced at the officer in the car's mirror and turned off the engine. The defendant got out of the car and " 'aggressively, quickly' " tried to pass Tisdale. The defendant wore baggy jeans and an untucked, long-sleeved baggy shirt. The defendant told Tisdale he was going to the store. When Tisdale asked for identification, the

10

defendant appeared agitated but retrieved it from the car. The defendant said he had no weapons and refused a quick pat-down search for weapons. The defendant began to walk away, toward the adjacent street. The officers detained him and found two loaded weapons and drugs. (*Perrusquia*, *supra*, 150 Cal.App.4th at pp. 231-232.)

The appellate court affirmed the trial court's order granting the defendant's motion to suppress evidence. The court reasoned: "The officer in this case had a hunch that something was amiss with defendant, and he turned out to be right. That he was right, however, cannot be used to retroactively justify a detention. As the trial court noted at the hearing's conclusion: '[T]his is why police work is difficult, complex and challenging[,] because it's difficult from a moral or practical standpoint to criticize the officer's actions.' We agree, yet at the same time we also agree with the trial court that the facts did not meet the legal standard for a detention. The officer must have 'specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. [Citation.]" (*Perrusquia*, *supra*, 150 Cal.App.4th at p. 234.)

Defendant argues the circumstances surrounding his traffic stop were even less persuasive than those found insufficient in *Perrusquia*. According to defendant, there was no prior information about specific crimes, defendant's vehicle was not poised to effect a hurried departure, defendant did not make any furtive movements or resist contact with the officers, and defendant did not attempt to flee or appear nervous. When defendant was detained he was no longer in a traffic lane but inside the parking lot of the gas station. Defendant contends: "The only reason for stopping [defendant], other than the fact it occurred in a high crime area, was that the officers found it 'odd' that [defendant] was stopped for no apparent reason."

In addition, defendant argues there was insufficient evidence that he impeded the flow of traffic in violation of Vehicle Code section 22400, subdivision (a) so as to justify

11

the traffic stop.  Section 22400, subdivision (a) states, in part:  "No person shall bring a vehicle to a complete stop upon a highway so as to impede or block the normal and reasonable movement of traffic unless the stop is necessary for safe operation or in compliance with law."

Contrary to defendant's assertion, Officer Pierce testified defendant's Monte Carlo stopped in the middle of the roadway with two cars behind it and none in front. Defendant's vehicle was at a complete stop in the road, impeding the flow of traffic as evidenced by the two cars stopped behind the Monte Carlo.  Unlike the vehicle in *Perrusquia*, which was parked outside a 7-Eleven store, defendant's car was inexplicably stopped on a roadway, leading to the reasonable suspicion that defendant was committing a traffic infraction by blocking traffic.  Under the totality of the circumstances considered by the trial court, Officers Nance and Pierce reasonably suspected defendant had committed or was about to commit a crime.  Therefore the court did not err in denying defendant's motion to suppress.

**Motion for Disclosure of Peace Officer's Personnel Records**

Defendant filed a motion prior to trial seeking discovery of the personnel files of Sergeant Ridenour, including all complaints regarding police misconduct under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.  Defendant argues the court abused its discretion by denying his motion.

**Background**

In his motion, defendant stated that in a previous case in 2001, Sergeant Ridenour lied in court, falsified his report, and violated defendant's *Miranda* rights.[2]  In an amended declaration, defendant alleged police reports by Officers Pierce, Nance, and Swails and technician Andre Chelli "fabricated, or mischaracterized the statements

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

regarding reasonable suspicion and probable cause to search [his] vehicle." He argued the information sought was relevant to his defense because the officers' propensities for dishonesty, discriminatory practices, and unlawful arrests were indicative of their dishonesty in the present case. The court denied the motion.

**Discussion**

A defendant is entitled to discovery from an officer's confidential personnel records if those files contain information potentially relevant to the defense. In order to obtain those records, the defendant must file a motion demonstrating good cause for the discovery. If the motion is granted, the court reviews the records in camera, with a subsequent disclosure to the defendant of information relevant to the subject matter in the pending litigation. (*Uybungco v. Superior Court* (2008) 163 Cal.App.4th 1043, 1048.) We review the trial court's decision for an abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

There is a relatively low threshold for establishing the good cause triggering an in camera review by the court. Defendant must present a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.) Defendant argues he demonstrated good cause and the trial court should have conducted an in camera review to determine what information should be disclosed.

In his motion, defendant sought the personnel records of Sergeant Ridenour, alleging that in a previous case against him, in 2001, Ridenour lied in court, falsified police reports, and violated defendant's *Miranda* rights. In an amended declaration in support of the motion defendant alleged that the police reports authored by Officers Pierce, Nance, and Swails and techinician Chelli "fabricated, or mischaracterized the statements regarding reasonable suspicion and probable cause to search [his] vehicle." Defendant also requested the records of these personnel.

13

However, nothing in defendant's motion connects his encounter with Ridenour years earlier with the traffic stop at issue in the present case. Ridenour arrived on the scene at least several minutes after the traffic stop took place. Defendant provides no specific factual scenario of officer misconduct involving Officers Nance, Pierce, or Swails or technician Chelli. Instead, defendant alleges that the officers and Chelli planted the gun and drugs in his car and ignored Orozco's statements that the gun and drugs belonged to her. Defendant has not established good cause for the production of the officers' personnel files, and the court did not err in denying the motion.

### Sentencing Error

Finally, defendant contends the sentence imposed on count 5 should have been stayed pursuant to section 654. The People agree the court improperly sentenced defendant on count 5 and argue the case should be remanded and defendant resentenced.

Defendant points out that the trial court imposed a doubled two-year sentence in count 2 and stayed that sentence pursuant to section 654. However, the court sentenced defendant to a consecutive term in count 5. The sentence on count 5, defendant argues, violates section 654, which proscribes double punishment for multiple violations of the Penal Code based on the same act or omission.

According to defendant: "[Defendant's] conduct in counts 1 and 2 (which the trial court here found to be subject to Penal Code section 654) is the same 'single physical act' that resulted in his conviction in count 5, possessing a controlled substance while in possession of a weapon. Under the facts of the case, [defendant] could not be convicted of violating Health and Safety Code section 11370.1, subdivision (a) if he did not also violate [former] Penal Code section 12020, subdivision (a)(1) because the same act of possessing the same gun was necessary for both counts." Since there was no evidence that defendant possessed the shotgun in question in counts 1 and 2 with an intent different from his possessing it in count 5, the trial court erred in sentencing him on count 5.

14

The People agree the court's sentence on count 5 ran afoul of section 654 and should be corrected. Accordingly, we shall order defendant's sentence on count 5 to be stayed pursuant to section 654.

In addition, the People contend the trial court erred in imposing sentence on count 5: "The court then purported to impose a consecutive, subordinate term of sixteen months in prison on Count 5 (possession of a controlled substance while in possession of a loaded, operable firearm [Health & Saf. Code, § 11370.1, subd. (a)]). [Citation.] But . . . the middle term for a violation of Health and Safety Code section 11370.1, subdivision (a) is three years — not two years. Thus, one-third of the middle term doubled should have been two years in prison — not sixteen months. The trial court's sentence on Count 5 was unauthorized and therefore should be corrected on remand."

As defendant points out, the abstract of judgment states defendant was sentenced under section 11370.1, subdivision (a) to a doubled one-third the middle term, or two years. The People rely on the clerk's minutes, which show the court sentenced defendant in count 5 to one-third the midterm of 16 months. The reporter's transcript also shows a sentence of 16 months on count 5. However, in a later minute order, an out-of-court entry by the court clerk shows a correct two-year sentence for both counts 4 and 5. Therefore, remand on count 5 is not required.

## DISPOSITION

Defendant's sentence in count 5 is stayed. In all other respects, the judgment is affirmed.

                                     RAYE          , P. J.

We concur:

       BUTZ        , J.

       HOCH      , J.

15