Filed 12/24/15  In re D.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | H041654<br>(Santa Cruz County<br>Super. Ct. No. J23327) |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>D.G.,<br><br>       Defendant and Appellant. | |

After the juvenile court denied his motion to suppress, D.G. admitted a juvenile wardship petition's allegation that he unlawfully possessed a firearm in violation of Penal Code section 29610.[1]  (See Welf. & Inst. Code, § 602, subd. (a).)  On appeal, he asserts that the trial court erred in denying the suppression motion.  (See Welf. & Inst. Code, § 800, subd. (a).)  We affirm the judgment.

---

[1] Penal Code section 29610 provides:  "A minor shall not possess a pistol, revolver, or other firearm capable of being concealed upon the person."  All further statutory references are to the Penal Code unless otherwise indicated.

# I

## *Procedural History*

On August 21, 2014, a juvenile wardship petition was filed against D.G., age 15. The petition alleged that on or about August 19, 2014 D.G. committed two felonies: (1) a violation of section 29610 by "unlawfully possess[ing] a pistol, revolver and firearm capable of being concealed upon the person" and (2) a violation of section 186.22, subdivision (a), by "unlawfully and actively participat[ing] in a criminal street gang with knowledge that its members engage in and have engaged in a pattern of criminal gang activity and did promote, further and assist in felony criminal conduct by gang members."

D.G. brought a written motion to suppress the observations of "the detaining, arresting or custodial officer" and "all fruits thereof," his own statements, and the "observations of the officers." It was argued that Officer Winston's pat search of D.G. for weapons, which occurred after Officer Cecena detained him for bicycle violations, was unlawful because the officers lacked reasonable, particularized suspicion to justify the pat-search, the "mere fact that [D.G.] may have given consent to have his body photographed during the pendency of an unlawful pat search vitiates the original consent," and the "second search" was tainted by the unlawful pat search. It was additionally argued at the hearing on the motion that the officer's direction to him to lift his clothing went beyond the scope of any consent to be photographed.

The juvenile court held an evidentiary hearing and then denied the suppression motion. The court found that the pat search was not unlawful and D.G. consented to being photographed.

On September 19, 2014, D.G. admitted that, on August 19, 2014, he unlawfully possessed a pistol, revolver, or firearm capable of being concealed on his person, a felony (count 1). He waived time as to count 2, which was not dismissed. A disposition hearing

2

was scheduled for October 14, 2014, which allowed time for D.G. to appear in Tulare County on a separate juvenile wardship petition.

On September 25, 2014, in Tulare County, D.G. admitted two allegations of the petition pending in Tulare County: (1) a violation of section 148, subdivision (a)(1) (resisting, delaying or obstructing an officer) and (2) a violation of Health and Safety Code section 11357, subdivision (b) (possession of not more than 28.5 grams of marijuana). The Tulare County juvenile court found D.G. to be a child described by the Welfare and Institutions Code section 602 and transferred the matter to Santa Cruz County for disposition.

On October 6, 2014, a transfer-in hearing was held in Santa Cruz County and the transfer was accepted. The matter was set for disposition on October 14, 2014.

A disposition hearing was held on both delinquency matters on October 14, 2014. The juvenile court declared D.G. a ward of the court and ordered him to reside in his mother's custody and comply with certain probation terms and conditions.

A notice of appeal was filed on November 12, 2014.

II

*Evidence at Suppression Hearing*

Karina Cecena is a City of Santa Cruz police officer. At approximately 6:25 p.m. on August 19, 2014, she was in uniform and on patrol in a marked patrol car in the area of Broadway and Campbell. She saw J.L.[2] riding his skateboard eastbound toward Ocean Street. The officer saw another Hispanic male, who appeared to be under 18 years of age, on his bicycle behind J.L., but she did not know the second male's name or whether he was on probation or a documented gang member. At the suppression hearing, Officer Cecena identified D.G. as the second male.

---

[2] The record does not disclose whether J.L. is an adult or a minor.

3

Officer Cecena initially talked to J.L. on the corner of Broadway and Campbell; D.G. continued to the east side of the intersection and waited there for J.L. They then continued together, riding toward the 7-Eleven. They appeared to be together.

Officer Cecena noted that D.G. was riding his bicycle on the sidewalk, not in a bike lane, and he was not wearing a helmet. She testified at the suppression hearing that D.G. was violating the law (1) by riding his bicycle on the sidewalk in violation of Vehicle Code section 21208 since a bike lane was available and (2) by not wearing a helmet in violation of Vehicle Code section 21211.[3]

---

[3] Vehicle Code section 21208 does not prohibit riding a bicycle on a sidewalk. It provides: "(a) Whenever a bicycle lane has been established on a roadway pursuant to Section 21207, any person operating a bicycle upon the roadway at a speed less than the normal speed of traffic moving in the same direction at that time shall ride within the bicycle lane, except that the person may move out of the lane under any of the following situations: [¶] (1) When overtaking and passing another bicycle, vehicle, or pedestrian within the lane or about to enter the lane if the overtaking and passing cannot be done safely within the lane. [¶] (2) When preparing for a left turn at an intersection or into a private road or driveway. [¶] (3) When reasonably necessary to leave the bicycle lane to avoid debris or other hazardous conditions. [¶] (4) When approaching a place where a right turn is authorized. [¶] (b) No person operating a bicycle shall leave a bicycle lane until the movement can be made with reasonable safety and then only after giving an appropriate signal in the manner provided in Chapter 6 (commencing with Section 22100) in the event that any vehicle may be affected by the movement." The Santa Cruz Municipal Code does, however, limit bicycle operation on sidewalks. Section 10.68.030 of that code provides in part: "No person shall ride a bicycle or electric bicycle upon sidewalks fronting and adjacent to commercial establishments, stores, or buildings used for business or commercial purposes." Vehicle Code section 21211 does not prohibit a minor from riding a bicycle without a helmet; that prohibition is contained in Vehicle Code section 21212, subdivision (a). Failure to comply with a Vehicle Code provision constitutes a punishable infraction unless otherwise provided. (Veh. Code, § 40000.1; see § 19.6 ["An infraction is not punishable by imprisonment. . . ."]; former § 19.8 subd. (a) (Stats. 2012, ch. 702, §1, p. 5764) [generally, "every offense declared to be an infraction is punishable by a fine not exceeding two hundred fifty dollars ($250)"]; see also Veh. Code, § 42001, subd. (d) ["Notwithstanding any other provision of law, a local public entity that employs peace officers . . . may, by ordinance or resolution, establish a schedule of fines applicable to

(continued)

4

From her patrol vehicle, Officer Cecena ran a warrant check on J.L. and learned there were "[u]nconfirmed misdemeanor warrants." She advised dispatch that she would make contact with J.L. and D.G. at the 7-Eleven, she asked dispatch to confirm the warrants, and she also requested a second unit to assist.

Officer Cecena was familiar with J.L. with whom she had prior contacts. She had completed field interview cards on him and arrested him perhaps two times. She knew that J.L. was affiliated with the Sureño gang. At that time, she knew that J.L. had been on probation under conditions that included a prohibition against possessing illegal or deadly weapons, but she did not know whether his probation was "current or expired." She recognized D.G. but could not recall from where; she later realized that she had previously seen him at "an at-risk youth function for the Santa Cruz Police Department."

When Officer Cecena made contact with D.G., he was standing to the left of the front doors of the 7-Eleven. The purpose of the contact was to advise D.G. about his violations. D.G. was holding his cell phone and a black beanie. She asked D.G. his name, and he told her his name. She asked him whether he was in Pride, which is an intervention program aimed primarily at gangs and sponsored by the Santa Cruz Police Department for at-risk youth. D.G. said he was in Pride. She advised him that he had violated the law and he needed to ride the bicycle in the bicycle lane and he also needed to wear a helmet since he was underage. While Officer Cecena was speaking to D.G., J.L. walked out of the 7-Eleven wearing a backpack and holding a skateboard.

Officer Cecena had received confirmation of the warrants for J.L.'s arrest. She turned her attention to J.L.

infractions committed by bicyclists within its jurisdiction. . . . If a bicycle fine schedule is adopted, it shall be used by the courts having jurisdiction over the area within which the ordinance or resolution is applicable instead of the fines, including penalty assessments and court costs, otherwise applicable under this code].)

5

At approximately 6:25 p.m. on August 19, 2014, William Winston, a City of Santa Cruz police officer, responded in uniform to the location of a 7-Eleven at 367 Ocean Street.  He arrived there about three minutes later.  It was slightly overcast but still light outside. In his opinion, the area around the 7-Eleven was a high crime area where violent crime, drug activity, prostitution, and gang activity occurred.  The area was "mainly considered a Sureño territory."

When Officer Winston heard the call, he recognized J.L.'s name.  The officer had come in contact with J.L. about 15 to 20 times before, generally in areas known to the officer to be areas of high gang activity.  J.L. was known to affiliate with the Sureño gang.  Sureño gang members often wear blue clothing, and Officer Winston believed that J.L. was associating with a Sureño gang based on his prior observation of J.L.'s clothing and his companions, whom the officer knew to be gang members.  Officer Winston had previously witnessed an arrest of J.L. during which a weapon, a hammer with a sharpened end, had been found hidden in his pants.  In the officer's opinion, which was based on his training and experience, it was the type of "improvised weapon" carried by a gang member.  The Alliance reporting system, which the Santa Cruz Police Department utilized, contained documentation, personally seen by Officer Winston that J.L. had admitted to being an active gang member.

When Officer Winston arrived in the area of the 7-Eleven on August 19, 2014, he saw J.L., Officer Cecena, and D.G.  He pulled into a parking spot directly in front of the store, and he got out of his patrol car to cover Officer Cecena.  No other officers were present.  D.G. was standing about five feet away from Officer Cecena and just to the side of the 7-Eleven's front doors.  Officer Cecena was speaking to J.L.  Officer Winston had never seen D.G. before.  He did not know whether D.G. was an active gang member or whether he was on probation.

Officer Cecena told J.L. that there was a warrant for his arrest.  Officer Cecena had J.L. turn around; she removed his backpack and gave it to Officer Winston, who had

6

arrived on the scene, and asked Officer Winston to search it. J.L. asked D.G. to take his skateboard.

Officer Cecena informed Officer Winston that D.G. had not been pat searched and told him to do so. At that point, D.G. was being detained by Officer Cecena, and she could not see D.G.'s waistband or pockets because he was wearing baggy clothing. D.G. told Officer Winston that he was not on probation.

Officer Cecena handcuffed J.L. and conducted a search incident to arrest. Officer Cecena found a pocketknife in J.L.'s right front pants pocket. After she pulled out the knife, she spoke to J.L. about it because he knew he was on probation and not allowed to possess any illegal or dangerous weapons. Officer Winston heard Officer Cecena speaking about the knife found on J.L.

D.G. and J.L. spoke to each other. It was obvious to Officer Winston that J.L. and D.G. knew each other. At some point, Officer Winston went through J.L.'s backpack.

Officer Winston told D.G., who was wearing a long shirt concealing the waistband of his pants, to set his cell phone down on the window ledge, to face away from the officer, and to put his hands behind his back. The officer grasped D.G.'s hands and patted the outside of D.G.'s clothing. He found nothing.

Following the pat search of D.G., Officer Winston and D.G. stood by. Officer Winston neither told D.G. to stay where he was nor told him that he was free to leave.

Officer Cecena searched J.L. again and then placed him in her patrol car. She returned to D.G. D.G. was not free to go while he was being detained for the bicycle violations. Officer Cecena, who had decided not to cite D.G. for the bicycle violations, told D.G. that she was giving him a verbal warning and she was not going to give him a ticket. Officer Cecena then asked D.G. in a normal speaking voice whether she could take some photographs of him and complete a field interview card, and he expressed consent.

7

At the time of Officer Cecena's question, Officer Winston was behind and to the left of her, approximately five or six feet away. Officer Wendy Ramm, who had arrived on the scene by that point, was contacting another juvenile approximately "a car and a half length behind" them. The three officers were wearing police uniforms and their duty belts. Two or three patrol cars were in 7-Eleven's parking lot.

While Officer Cecena obtained a camera from Officer Ramm, D.G. stayed in the same spot and played with his cell phone. Officer Cecena never told D.G. he was free to go, and he never asked to go.

Officer Cecena took three photographs of D.G.: one of his fully body, a second of his upper body, and a third of his tattoo. For the second photograph, Officer Cecena asked D.G. to look at the camera. Officer Cecena took the third photograph after she asked D.G. whether he had any tattoos and he showed her a tattoo of "Maria" on his inner right forearm.

D.G. never told Officer Cecena to stop taking pictures. While speaking to D.G., Officer Cecena never raised her voice.

Officer Cecena asked D.G. whether he was wearing a belt and he said yes. At this point, D.G. was free to go from Officer Cecena's viewpoint, but he did not ask to go. She asked D.G. to lift up his shirt because she wanted to see the belt's color. D.G. quickly lifted and dropped the shirt. Officer Cecena asked D.G. to lift his shirt again because she had not seen his belt. When he complied, the officer saw part of a butt of a gun. She "immediately grabbed onto his right arm and pushed him up against the glass [wall] of the 7-Eleven."

D.G. was trying to push off from the wall. Officer Waley, who had arrived on the scene by that point, assisted in putting handcuffs on D.G. A number of other officers arrived about that time.

Officer Cecena indicated at the suppression hearing that she had directed Officer Winston to pat search D.G. for a number of reasons. At that time, she knew that

8

J.L. was a Sureño gang member and that he had been arrested at the beginning of the year for possessing a knife on the campus of Louden Nelson.  Blue is the color associated with the Sureño gang.  D.G. was wearing a button-up, short-sleeved, black and "blue-ish" checkered shirt, which went down to his mid-thighs, and dark blue jeans.  The blue in the print of his shirt was within the range of blue worn by Sureño gang members.  Gang members wear baggy clothing to conceal weapons.  D.G. was wearing baggy clothing, and she could not see D.G.'s waistband or pockets, which were common places people hold weapons.  It was not uncommon for older gang members to have a younger associate hold their weapons.  The 7-Eleven was located in a "high crime area" and a Sureño gang area.

At the suppression hearing, Officer Winston explained his reasons for pat searching D.G., which included Officer Cecena's information that D.G. had not been pat searched and the fact that they were in a high crime area where gang crime was often committed.  In addition, D.G. was wearing baggy clothing, which Officer Winston knew from training or experience "can be worn to conceal weapons on a person's body" and he knew that more experienced and older gang members will oftentimes ask younger gang members to carry weapons for them, particularly if the older members are on probation.  Officer Winston felt it was important for officer safety purposes to pat search D.G. because D.G. was associating with someone he knew to be a gang member.  He also considered the fact that a knife had been discovered in J.L.'s possession by Officer Cecena.

## III

### *Discussion*

A.  *Standard of Review*

"[W]hen defendants move to suppress evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant."  (*People v.*

9

*Williams* (1999) 20 Cal.4th 119, 136 (*Williams*).)  "[T]he burden of proving the justification for the warrantless search or seizure lies squarely with the prosecution. [Citations.]" (*People v. Johnson* (2006) 38 Cal.4th 717, 723.)  "[O]nce the prosecution has offered a justification for a warrantless search or seizure, defendants must present any arguments as to why that justification is inadequate.  [Citation.]" (*Williams*, *supra*, at p. 130.)

"[I]f defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal." (*Williams*, *supra*, 20 Cal.4th at p. 130.)  "Defendants cannot . . . lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked." (*Id.* at p. 131.)  "Defendants who do not give the prosecution sufficient notice of these inadequacies cannot raise the issue on appeal. '[T]he scope of issues upon review must be limited to those raised during argument . . . . This is an elemental matter of fairness in giving each of the parties an opportunity adequately to litigate the facts and inferences relating to the adverse party's contentions.' [Citation.]" (*Id.* at p. 136.)

"The standard of review of a trial court's ruling on a motion to suppress is well established and is equally applicable to juvenile court proceedings." (*In re Lennies H.* (2005) 126 Cal.App.4th 1232, 1236.)  "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.  (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597; *People v. Lawler* (1973) 9 Cal.3d 156, 160.)" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

B.  *Detention*

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person

10

would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*United States v. Mendenhall* (1980) 446 U.S. 544, 554-555, fn. omitted; cf. *Brendlin v. California* (2007) 551 U.S. 249, 261 [in determining whether a passenger of a vehicle was detained, "the issue is whether a reasonable passenger would have perceived that the show of authority was at least partly directed at him, and that he was thus not free to ignore the police presence and go about his business"].)

"The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs. [Citations.]" (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573-574 (*Michigan*).) It is an objective test. (See *California v. Hodari D.* (1991) 499 U.S. 621, 628; *Michigan*, *supra*, at p. 574.)

D.G. does not dispute that his initial encounter with Officer Cecena based on Vehicle Code violations was lawful. After Officer Cecena informed D.G. that he had violated the law, a reasonable person would not have believed he was free to leave, even though Officer Cecena temporarily turned her attention to arresting J.L., because the matter of D.G.'s violations had not been resolved.

C. *Pat Search*

When D.G. was under detention, Officer Winston pat searched him. D.G. asserts that Officer Winston did not have a reasonable suspicion that he was armed and dangerous and, therefore, the pat search was illegal. D.G. maintains that the circumstances—specifically Officer Winston's knowledge that J.L. was a Sureño, the

11

7-Eleven was located in a high crime and Sureño area, more experienced, older gang members oftentimes ask younger gang members to carry weapons for them together with the fact D.G. was wearing baggy clothes—were insufficient to justify a pat search of him.

In *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court stated: "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (*Id.* at p. 27.) "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations.]" (*Ibid.*, fn. omitted.) "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. [Citation.]" (*Ibid.*) Consequently, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (*Id.* at p. 30.)

"Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." (*Maryland v. Buie* (1990) 494 U.S. 325, 334, fn. 2.) To justify a pat-down, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." (*Arizona v. Johnson* (2009) 555 U.S. 323,

12

327 (*Arizona*).) The purpose of a pat search is "to allow the officer to pursue his investigation without fear of violence." (*Adams v. Williams* (1972) 407 U.S. 143, 146.) "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. [Citation.]" (*Ibid*., fn. omitted.)

It is clear that the pat search of D.G. cannot be predicated on his bicycle violations since they provided no reason whatsoever to believe that he was armed or dangerous. In fact, the bicycle helmet requirement was aimed at protecting minors like him. D.G. was not a known member or associate of a gang. Nevertheless, we conclude that a pat search was justified based on the totality of circumstances.

Both Officer Cencena and Officer Winston knew that J.L. was a Sureño gang member and that the 7-Eleven was in a high crime, Sureño area. Officer Cecena knew that J.L. had previously been arrested for unlawful possession of a weapon, J.L. had been on probation with a weapons condition, and there were warrants for his arrest. She also knew that D.G. was in Pride, a program aimed at at-risk youth, D.G. was J.L.'s companion, the blue in D.G.'s checkered shirt was consistent with the blue color associated with Sureños, baggy clothes were worn by gang members to conceal weapons, D.G. was wearing baggy clothes, and it was not uncommon for gang members to have a younger associate hold their weapons. On top of those circumstances, Officers Cecena and Winston were initially the only officers dealing with two subjects, one a gang member who was being placed under arrest and discovered to be in possession of a knife and the other his companion.

Although Officer Winston was not aware of exactly the same facts as Officer Cecena, he observed that D.G. appeared to be in the company of J.L., a known Sureño member. Officer Winston knew that J.L. had previously concealed a sharpened hammer in his pants and that a knife had just been found in his pants. The officer also knew from his training and experience that experienced, older gang members oftentimes

ask younger gang members to carry weapons for them, baggy clothing can conceal weapons, and D.G. was wearing baggy clothing.

While some of the circumstances would not have been sufficient to justify a pat search if considered in isolation, together they justified a pat search of D.G. (See e.g., *People v. Mendoza* (2011) 52 Cal.4th 1056, 1082 [pat search justified in part by baggy clothing]; *People v. Collier* (2008) 166 Cal.App.4th 1374, 1377-1378 [same], 1377, fn. 1 [while police do not enjoy "carte blanche to pat down anyone wearing baggy clothing," "the wearing of baggy clothing, coupled with other suspicious circumstances, . . . furnishes the requisite facts to support a patdown for weapons"].) "[T]he fact that an area involves increased gang activity may be considered if it is relevant to an officer's belief the detainee is armed and dangerous. While this factor alone may not justify a weapon search, combined with additional factors it may." (*People v. King* (1989) 216 Cal.App.3d 1237, 1241.)

The validity of the pat search would be a closer call if we were limited to the facts known to Officer Winston, who began to assist while Officer Cecena's arrest of J.L. and her detention of D.G. were in progress. In assessing whether the pat search violated the Fourth Amendment, we consider the information known to Officer Cecena since she directed the backup officer to pat search D.G. (See *U.S. v. Massenburg* (4th Cir. 2011) 654 F.3d 480, 492 ["The collective-knowledge doctrine, as enunciated by the Supreme Court, holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer."]; *U.S. v. Ramirez* (9th Cir. 2007) 473 F.3d 1026, 1037 ["Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment"]; cf. *United States v. Hensley* (1985) 469

14

U.S. 221, 233 ["Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, [citation] and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department"].)  Officer Cecena knew D.G.'s connection to Pride, and she had observed D.G. with J.L. before Officer Winston arrived. She knew that it was not uncommon for older gang members to have younger associates hold their weapons.

This case is readily distinguishable from *Ybarra v. Illinois* (1979) 444 U.S. 85 (*Ybarra*).  In *Ybarra*, while executing a warrant authorizing the search of a tavern and the bartender, a police officer pat searched customers, including Ybarra, for weapons.  (*Id*. at pp. 88-89.)  The United States Supreme Court determined the frisk of Ybarra was not justified under *Terry* since Ybarra was merely a patron and he "gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening." (*Ybarra*, *supra*, at p. 93.)

In contrast to Ybarra, D.G. was not a mere bystander.  Officer Cecena had stopped D.G. for violating the law, and he was accompanying J.L., who was a known Sureño member being arrested pursuant to warrant.  D.G. acknowledges that his blue clothing and his association with a person whom the police believed to be a gang member "could lead to an inference that [he] too was associated with a gang . . . ."  This inference together with other reasonable inferences drawn from the facts based upon the officers' knowledge and experience supported the reasonable suspicion that, at the time of the pat search, D.G. was armed and posed a danger to the officers' safety. (See *Terry*, *supra*, 392 U.S. at pp. 27-28, 30; cf. *In re Stephen L.* (1984) 162 Cal.App.3d 257, 260-261 [upholding pat search of male minor found in company of four known male gang members and a sixth male near gang graffiti in a park that was a gang hangout where

15

officers were investigating suspected vandalism and where an officer was aware of prior gang activity at the park and he knew gang members had carried weapons in the past].)

*People v. Hester* (2004) 119 Cal.App.4th 376 (*Hester*) does not persuade us differently since found only that there was no lawful stop. In *Hester*, a police officer "inferred that each individual in the Chevrolet was a gang member because the only individual in the car that he identified was known to him to be an East Side Crip, the cars were driving in East Side Crips territory, and the Chevrolet contained Black males between 15 and 25 years of age." (*Id*. at p. 388.) In *Hester*, the appellate court stated: "Reducing this stop to its essence, [the officers] acted because a passenger in the vehicle was a member of the East Side Crips. Mere membership in a criminal street gang, without additional *facts* supporting an inference of criminal activity, does not permit a detention. (*People v. Rodriguez* (1993) 21 Cal.App.4th 232, 239.) [The officers] violated the Fourth Amendment rights of the occupants of the Chevrolet by stopping the vehicle without a particularized and objective basis for suspecting the persons stopped of criminal activity." (*Id*. at p. 392.)

The lawfulness of a stop and the lawfulness of a pat search of a person who has been permissibly stopped are entirely different questions that require separate analysis. (See *Arizona*, *supra*, 555 U.S. at pp. 326-327 [an investigatory stop is lawful when a "police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense" and a frisk for weapons is justified when there is a reasonable suspicion that "the person stopped is armed and dangerous"]; *U.S. v. McKoy* (1st Cir. 2005) 428 F.3d 38, 39 [To justify a frisk for weapons, "[i]t is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met"].) In this case, D.G. was properly stopped.

D.G.'s reliance on *People v. Perrusquia* (2007) 150 Cal.App.4th 228 is likewise misplaced. In that case, the appellate court concluded only that "the officer lacked

16

specific, articulable facts justifying the detention" outside a 7-Eleven store.  (*Id*. at p. 230.)

We conclude that the pat search of D.G. was constitutionally valid.  "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."  (*Terry*, *supra*, 392 U.S. at p. 23; cf. *Arizona*, *supra*, 555 U.S. at p. 334, fn. omitted [In the context of a stop for a traffic infraction, an officer is not constitutionally required to give a passenger, whom she had reason to suspect was armed and dangerous, "an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her]".)

D.  *Exclusionary Rule*

D.G. now argues that the evidence of the gun must be suppressed because it was "obtained as a direct result of the unlawful pat search and detention."  We have found that the pat search was lawful.  Even assuming arguendo that the pat search was illegal, the evidence of the gun was not excludable as "fruit of the poisonous tree."

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " (*Davis v. United States* (2011) 564 U.S. __, __ [131 S.Ct. 2419, 2426].)  The sole purpose of the exclusionary rule is "to deter future Fourth Amendment violations.  [Citations.]" (*Ibid*.)  "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure [citation], but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'  [Citation.]  It 'extends as well to the indirect as the direct products' of unconstitutional conduct.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)."  (*Segura v. United States* (1984) 468 U.S. 796, 804 (*Segura*).)

"In the typical 'fruit of the poisonous tree' case . . . , the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, and the question

17

before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality. Thus most cases begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity." (*United States v. Crews* (1980) 445 U.S. 463, 471.)

In *Wong Sun*, the United States Supreme Court refused to "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police." (*Wong Sun*, *supra*, 371 U.S. at pp. 487-488, italics added.) The court stated that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" (*Id.* at p. 488.)

The United States Supreme Court "has never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.' [Citations.]" (*Segura*, *supra*, 468 U.S. at p. 815.) "[The United States Supreme Court's] cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.' *United States v. Crews*, 445 U.S., at 471." (*Ibid.*) "[B]ut-for causality is only a necessary, not a sufficient, condition for suppression." (*Hudson v. Michigan* (2006) 547 U.S. 586, 592 [although police violated knock-and-announce rule, "constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence"]; see *id.* at pp. 603-604 (conc. opn. of Kennedy, J.) ["When . . . a violation results from want of a 20-second pause but an ensuing, lawful search lasting five hours discloses evidence of criminality, the failure to wait at the door cannot properly be described as having caused the discovery of evidence."], *id.* at p. 604 (conc. opn. of Kennedy, J.) ["relevant evidence was discovered not because of a failure to knock

18

and announce, but because of a subsequent search pursuant to a lawful warrant"]; see also *New York v. Harris* (1990) 495 U.S. 14, 19 ["[A]ttenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.' [Citation.]"].)

Here, there was no causal connection between the pat search conducted by Officer Winston and Officer Cecena's observation of the butt of a gun concealed under D.G.'s shirt. The pat search produced no evidence, either directly or indirectly. D.G. did not give his consent to be photographed during the pat search. The evidence did not show that Officer Cecena's decision to ask for D.G.'s consent to be photographed once she gave him a warning or his immediate consent were causally related to the pat search. Thus, even assuming arguendo that the pat search was illegal, the threshold requirement of "but-for" causation for application of the exclusionary rule was not satisfied.

E. *Duration of Detention*

D.G. does not dispute that "the initial encounter" between Officer Cecena and him was lawful. Nevertheless, he asserts that the officer's question about photographing him unnecessarily prolonged his detention and Officer Cecena's request to photograph him occurred while he was illegally detained.

Respondent asserts that D.G.'s claim that his detention was unnecessarily prolonged was not preserved since D.G. did not raise that issue in his moving papers or in argument at the suppression hearing. In ruling on the motion, the juvenile court expressly observed that this issue was not raised. His counsel's argument below, to which D.G. now points, concerned whether or not it was reasonable to believe that he was free to leave when Officer Cecena asked for his consent, not whether the officer's question unduly prolonged the detention. We agree that D.G. forfeited any claim that his detention was unduly prolonged. (*Williams*, *supra*, 20 Cal.4th at pp. 130, 136.)

In any case, D.G.'s contention that Officer Cecena unnecessarily prolonged the detention by asking for his consent is meritless. Even though D.G. had no reason to

19

believe that he was free to leave before Officer Cecena asked for his consent to being photographed, the detention to that point was lawful. It was entirely reasonable for Officer Cecena to have attended first to the matter of arresting J.L. pursuant to warrant. (See *Terry*, *supra*, 392 U.S. at p. 19 ["the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion"].) After placing J.L. in her patrol vehicle, Officer Cecena, who still needed to complete the detention by either citing D.G. or giving him a warning, gave D.G. a verbal warning. The simple request for consent did not unduly prolong D.G.'s detention.

In *Rodriguez v. United States* (2015) 575 U.S. __ [135 S.Ct. 1609], the officer issued a written warning to the driver and returned documents. (*Id*. at p. __ [135 S.Ct. at p. 1613.) The officer then asked the driver for permission to walk his dog around the vehicle; the driver said no. (*Ibid*.) The officer then directed the driver "to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for [a] second officer." (*Ibid.*) When the second officer arrived, the first officer conducted a dog sniff by leading the dog around the vehicle. (*Ibid*.) "[S]even or eight minutes had elapsed from the time [the detaining officer] issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine." (*Ibid*.) Unlike the driver in *Rodriguez*, D.G. immediately consented.

A court "assessing whether a detention is too long in duration to be justified as an investigative stop" "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. [Citation.]" (*United States v. Sharpe* (1985) 470 U.S. 675, 686; see *Rodriguez v. United States*, *supra*, 575 U.S. __ [135 S.Ct. at p. 1614] ["Authority for [a traffic stop] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe*, 470 U.S., at 686 (in determining the reasonable duration of a stop, 'it [is] appropriate to examine whether the police diligently pursued [the] investigation')."]; *People v. McGaughran* (1979) 25 Cal.3d 577, 584 ["[T]he law

20

contemplates that the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop"].)  "An officer's inquiries into matters unrelated to the justification for the traffic stop, . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.  [Citation.]" (*Arizona*, *supra*, 555 U.S. at p. 333.)  The moment it took for Officer Cecena to ask for and obtain D.G.'s consent did not measurably extend the duration of the stop.  Therefore, his consent was not secured during an illegal detention and the exclusionary rule had no application.  As discussed below, the ensuing encounter was consensual.

F.  *Voluntariness of Consent*

On appeal, D.G. contends that his consent to be photographed was coerced by the unlawful pat-down, detention, and the officers' show of authority.  He maintains that, although Officer Cecena asked him whether she could photograph him, he was only 15 years old and the environment was coercive because J.L. had been placed in the back of police vehicle and three uniformed officers and patrol vehicles were present.  He contends that the timing of Officer Cecena's request for consent, which followed her verbal warning, "made the warning seem conditional upon [him] complying with the request for photographs . . . ."

"The voluntariness of consent is a question of fact to be determined from the totality of circumstances.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 (*Schneckloth*); [*People v.*] *Jenkins*, [(2000)] 22 Cal.4th 900, 973.)  If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given— i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.'  (*Schneckloth*, *supra*, at p. 233; see [*Florida v.*] *Royer*, [(1983)] 460 U.S. 491, 497.)"  (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446.)  "[K]nowledge of a right to refuse is not a prerequisite of a voluntary consent."  (*Schneckloth*, *supra*, at p. 234.)

21

"Our review of the trial court's implied finding that defendant voluntarily consented to the search is limited. 'The . . . voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied must be upheld if supported by substantial evidence." ' (*People v. James* (1977) 19 Cal.3d 99, 107.)" (*People v. Monterroso* (2004) 34 Cal.4th 743, 758.)

In this case, after the unproductive pat-search, Officer Winston and D.G. waited while Officer Cecena completed the arrest of J.L. Officer Cecena indicated to D.G. that she was going to let him off with only a warning. There was no evidence that any of the officers present were speaking or behaving in an aggressive or threatening manner or Officer Cecena's question about photographing D.G. conveyed a veiled threat that D.G.'s refusal to consent would result in a citation instead of a mere warning.

The evidence did not show that D.G. merely submitted to a show of force or authority that left him no choice. Officer Cecena's inquiry whether she could photograph him contemplated a yes or no answer, which indicated that D.G. could decline. He indicated that he consented. D.G.'s subsequent cooperation buttresses the conclusion that his consent was voluntary. While youth may be a factor to be considered in assessing whether a person consented, there was no evidence that D.G. was merely acquiescing to authority due to immaturity or inexperience. We uphold the trial court's determination that D.G. voluntarily consented to being photographed.

G. *Scope of Consent*

" 'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?' (*Florida v. Jimeno* (1991) 500 U.S. 248, 251.) 'Whether the search remained within the

boundaries of the consent is a question of fact to be determined from the totality of the circumstances. [Citation.] Unless clearly erroneous, we uphold the trial court's determination.' [Citations.]" (*People v. Tully* (2012) 54 Cal.4th 952, 983-984.)

The clear purpose of taking the photographs of D.G. was to document his appearance. Officer Cecena took full-body and upper-body photographs of D.G. and a photograph of his tattoo with his consent and cooperation. After Officer Cecena asked whether D.G. had a belt and he indicated he did, she asked D.G. to lift his shirt. A reasonable person would have understood that D.G.'s consent to be photographed embraced his outward appearance, including his attire. It could be reasonably inferred from the evidence that the officer's request for D.G. to lift his shirt was for the purpose of seeing and then photographing his belt. The evidence supported the juvenile court's implicit determination that Officer Cecena did not exceed the lawful scope of D.G.'s consent when she asked him to lift his shirt for that purpose, and its determination was not clearly erroneous.

DISPOSITION

The judgment is affirmed.

23

 

 

_____<br>ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MIHARA, J.

*The People v. D.G.*
H041654