[No. G037094. Fourth Dist., Div. Three. Apr. 25, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
OSCAR HUMBERTO PERRUSQUIA, Defendant and Respondent.

**COUNSEL**

Tony Rackauckas, District Attorney, and Brian F. Fitzpatrick, Deputy District Attorney, for Plaintiff and Appellant.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Respondent.

---

**OPINION**

**MOORE, J.**—In the trial court, defendant Oscar Humberto Perrusquia filed a motion to suppress under Penal Code section 1538.5.[1] He argued the police officer did not have reasonable suspicion to detain him and conduct a patdown search. After granting the motion, the trial court dismissed the case. The Orange County District Attorney (district attorney) appeals, arguing the police officer lawfully detained defendant. We agree with the trial court that the officer lacked specific, articulable facts justifying the detention and affirm the judgment and subsequent dismissal.

I

FACTS

On January 13, 2006, Anaheim Police Officer Ryan Tisdale was on patrol near the corner of Harbor and La Palma. A 7-Eleven convenience store was located near that intersection, and Tisdale intended to stop there for a cup of coffee. Earlier that day at roll call, Tisdale and fellow officers had been briefed by detectives about a series of six armed robberies at 7-Eleven stores in Anaheim. The description provided was of a Black or Hispanic male in his

---

[1] Subsequent statutory references are to the Penal Code.

late 20's. The detectives wanted the patrol officers to do patrol checks and keep their eyes on 7-Eleven stores because they had been hit so often.

Further, based on his prior experience, Tisdale knew the area around that particular 7-Eleven was a high-crime area. During his patrols, he had had contacts in the area relating to assault with a deadly weapon and drug complaints. He also knew that numerous gangs were tied to the area, and he had frequently worked with gang detectives in the area during his patrol hours.

Tisdale entered the 7-Eleven's parking lot at approximately 11:26 p.m. He noticed defendant's car as he entered the lot. It was parked facing La Palma, next to the exit. The car caught his attention because there were other spots available closer to the store's entrance, and someone was inside with the engine idling.

Tisdale stood behind the car and watched defendant. He could see defendant crouched low in the driver's seat. Defendant was leaning against the glass and Tisdale felt it looked suspicious. After 45 seconds or so, a second officer pulled into the lot and joined Tisdale, and they continued observing defendant. Defendant had not moved during this time. The two officers then began approaching, and as they reached the rear of defendant's car, Tisdale heard what he described as "kind of like a fumbling." He then heard what he believed to be something dropping to the floor of the car with a "thud."

Tisdale saw defendant look at him in the car's side mirror, and at that point defendant turned the car's engine off. Defendant exited the vehicle, and "aggressively, quickly" tried to pass Tisdale. Defendant was wearing baggy jeans and an untucked, long-sleeved baggy shirt. Tisdale asked defendant what was going on, and defendant replied to the effect that he was going to the store. Tisdale asked defendant to "hang on a second." Tisdale asked for identification, and defendant appeared agitated. Defendant asked: "What's going on? I am just going to the store, I am just going to the store," and Tisdale again asked for identification. Defendant retrieved his identification from the car, and Tisdale asked if he had any weapons. Defendant said he did not, and Tisdale asked if he could do a "quick pat-down search for weapons" and defendant answered no. Tisdale could not tell if defendant was armed without the patdown search. He repeated that he needed to do a quick patdown search, and defendant again answered no and started to walk away, not back to his car or toward the store, but to the adjacent street.

At that point, the other officer, who had been standing back while Tisdale was talking to defendant, intervened and both officers took hold of defendant's arms and wrists. After Tisdale took defendant's right wrist, he touched

defendant's waistband and immediately felt the handle of a gun. Tisdale pulled out the gun, a loaded nine-millimeter automatic, and dropped it on the ground. He then moved defendant toward a grassy area in front of defendant's car and he and the other officer took defendant to the ground.

After defendant was handcuffed, Tisdale asked if he had any other weapons on him, and defendant answered yes. Defendant said he had an additional revolver in his waistband, and Tisdale retrieved a loaded .22-caliber gun. Tisdale then conducted an additional search for other weapons and called gang detectives. A subsequent search through defendant's pockets revealed a small bag containing a substance that appeared to be methamphetamine and a glass smoking pipe.

Defendant was charged with two counts of having a concealed firearm in a vehicle (§ 12025), one count of possessing a controlled substance with a firearm (Health & Saf. Code, § 11370.1), one count of possessing a controlled substance (Health & Saf. Code, § 11377) and two counts of carrying a loaded, unregistered firearm in public (§ 12031). Defendant moved to suppress the evidence pursuant to section 1538.5.

At the conclusion of the hearing, the magistrate granted the motion. The court stated: "[T]he test being were the officers . . . able to articulate specific facts from which an ordinary person would believe that a crime has been or is about to be committed, that basically this situation here would lead an ordinary officer under the circumstances to a common sense belief that this is something he should look at and investigate and should the circumstances have worked out different where the defendant didn't at some time exercise his right not to talk to the officers, the argument would then be that the show of authority was insufficient to have caused his submission and this is consensual. [¶] On these circumstances here, he did exercise his option at the time to not consensually remain and at the time, while the officers may have had a hunch that something was going on and justifiably wanted to talk to him about it further, they cannot state an articulable set of facts which would lead a reasonable person to believe that a crime was being committed or was about to be committed so therefore the laying on of hands at that time was without reasonable cause and so the motion was granted." Given that the motion was granted, the district attorney was unable to proceed, and the court dismissed the case.

II

DISCUSSION

The district attorney now appeals from the trial court's decision to grant defendant's 1538.5 motion. "An appellate court's review of a ruling on such

a motion is governed by well-settled principles: We defer to the trial court's findings of fact that are supported by substantial evidence, but in all other respects the court's ruling is subject to independent review. [Citation.]" (*People v. Britton* (2001) 91 Cal.App.4th 1112, 1118 [111 Cal.Rptr.2d 199].)

■ "[C]ircumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation." (*In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957].) The key consideration, as with all Fourth Amendment issues, is " 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " (21 Cal.3d at p. 892.)

An investigative stop, such as the one conducted by Tisdale, is valid if "the circumstances known or apparent to the officer . . . include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C., supra*, 21 Cal.3d at p. 893.)

The United States Supreme Court, however, has specifically rejected a "divide-and-conquer" analysis in which individual facts are considered in isolation. (*United States v. Arvizu* (2002) 534 U.S. 266, 274 [151 L.Ed.2d 740, 122 S.Ct. 744].) Reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing. [Citation.]" (*Id.* at p. 273.)

Reasonable suspicion, both sides agree, cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124 [145 L.Ed.2d 570, 120 S.Ct. 673].) Even recent, specific crimes, without additional factors specific to the defendant, are not sufficient. (*In re Tony C., supra*, 21 Cal.3d at p. 897.)

Many of the facts relied upon here are unrelated to defendant. There had been a recent string of robberies at 7-Eleven stores in Anaheim. The area in which this particular 7-Eleven was located was known as a high-crime area and for gang activity.

We consider the facts that are specific to defendant. When Tisdale arrived, he noticed defendant's car because it was parked with the engine idling near a street exit and away from the store's entrance, despite the fact that spaces closer to the store were available. As the officers approached defendant's car, Tisdale heard what he described as "kind of like a fumbling" and a "thud"

that might have been something dropping to the floor of the car. When defendant noticed Tisdale and the other officer, he apparently tried to avoid contact with them, abruptly turning off the engine, and exiting the car. Tisdale asked defendant what was going on, and defendant stated that he was going to the store. Tisdale asked defendant to "hang on a second."

Importantly, the district attorney conceded at oral argument that defendant was detained from the moment Tisdale said "hang on a second." We might not have reached this conclusion, were we determining the issue independently, but we accept the district attorney's concession. Thus, we look only to the facts prior to that point to determine whether the detention was reasonable.

In sum: Defendant's car was running and parked near an exit, Tisdale heard something in the car as the officers approached, and defendant tried to avoid contact with the officers. The officers permitted defendant to retrieve his identification from his car, which is some indication they did not associate the thud they heard with danger. Nothing in the record indicates that Tisdale matched defendant's physical appearance to the description of the robbers prior to the time he was detained. Even with the additional facts regarding the string of robberies, we cannot disagree with the magistrate that the district attorney failed to show "specific facts from which an ordinary person would believe that a crime has been or is about to be committed . . . ."

Unlike several of the cases cited by the district attorney, here, the hour was not particularly late, and the store was, apparently, open. (Cf. *People v. Holloway* (1985) 176 Cal.App.3d 150 [221 Cal.Rptr. 394]; *People v. Davis* (1968) 260 Cal.App.2d 186 [67 Cal.Rptr. 54].) There were no immediately highly suspicious facts such as the flight of a defendant's four companions. (*People v. Holloway, supra*, 176 Cal.App.3d at pp. 152–153.) Indeed, the district attorney does not cite any case where the facts are quite as thin and nonspecific as they are here.

The officer in this case had a hunch that something was amiss with defendant, and he turned out to be right. That he was right, however, cannot be used to retroactively justify a detention. As the trial court noted at the hearing's conclusion: "[T]his is why police work is difficult, complex and challenging[,] because it's difficult from a moral or practical standpoint to criticize the officer's actions." We agree, yet at the same time we also agree with the trial court that the facts did not meet the legal standard for a detention. The officer must have "specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C., supra*, 21 Cal.3d at p. 893.)

## III

## DISPOSITION

The judgment of dismissal is affirmed.

O'Leary, J., concurred.

**O'LEARY, J., Concurring.**—I join in the majority opinion because I agree with both its reasoning and its result. Our dissenting colleague places some reliance on *People v. Souza* (1994) 9 Cal.4th 224 [36 Cal.Rptr.2d 569, 885 P.2d 982]. I write separately to distinguish *Souza* from the facts before us and to query how an individual should properly decline a "consensual encounter" with the police.

I agree with our dissenting colleague regarding the general criteria under which we evaluate the propriety of a detention, but I find his reliance on *Souza* to be misplaced. In *Souza* an officer was on patrol at approximately 3:00 a.m., in a "high-crime" residential area when he observed two people standing in almost complete darkness near a parked car. He described seeing one of the two individuals leaning toward the car as if talking to someone inside. When the officer directed his patrol car's spotlight into the car's interior, the two people in the front seat immediately bent down toward the floorboard, and the individual standing outside the car took off running. The Supreme Court concluded that from these circumstances, the area's reputation for criminal activity, the presence of two people near a parked car very late at night in total darkness, and the evasive conduct by the three individuals, the officer had reasonable suspicion to detain the suspects. Our circumstances are significantly different.

Here, observations are made at 11:30 p.m., in the parking lot of an open convenience store.[1] Tisdale testified that when he first saw him, Perrusquia was parked and seated "just hunched over slightly" not to where he could not be seen, "but he was kind of leaning against the glass or down a little bit lower." There is no evidence Perrusquia repositioned himself in response to police presence. The dissent states, "Rather than taking one of the open spots close to the store, defendant chose to park his vehicle near the exit . . . ." (Dis. opn., *post*, at p. 239.) There is no evidence Tisdale saw Perrusquia park his vehicle, or that an open spot closer to the store was available when

---

[1] Our dissenting colleague relies on the fact that Perrusquia is "a male Hispanic . . . in his late 20's." (Dis. opn., *post*, at p. 238.) The record does not reflect that the officer made observations at any time regarding Perrusquia's ethnicity or age.

Perrusquia parked. Given the rapid turnover of parking spots at open convenience stores, I cannot assume Perrusquia intentionally bypassed open parking spots. Also, unlike the suspect in *Souza*, Perrusquia did not take off running when he became aware of the police, rather he turned off the engine in his car, exited his vehicle, and attempted to walk quickly past the officer. I do not find *Souza* compelling given the facts before us.

Courts have long recognized that police officers enjoy First Amendment rights just like the rest of us. And, there is nothing in the Constitution that prevents a police officer from attempting to engage an individual in conversation. (*United States v. Mendenhall* (1980) 446 U.S. 544, 553 [64 L.Ed.2d 497, 100 S.Ct. 1870].) Frequently, we are reminded by the prosecution that when approached by the police, suspects are free to walk away. Should they remain and accept the invitation to engage in conversation they have voluntarily engaged in a consensual encounter and no Fourth Amendment scrutiny is triggered. Our dissenting colleague comments that the appellant had the right to avoid the officer, "but it is an appropriate consideration in determining the legality of . . . Tisdale's actions." (Dis. opn., *post*, at p. 239.) My query is how does one exercise one's right to decline a conversation with a police officer without assisting the officer in establishing reasonable suspicion?

**BEDSWORTH, Acting P. J.,** Dissenting.—This is the compact we make with our police: They agree to take on the darkest and dirtiest, most difficult job in our society, in return for which we agree to judge them not by their results, but by the reasonableness of their actions. We do this in recognition of the fact their decisions must often be made with very little reflection, on the basis of rapidly changing circumstances, rife with danger to them and to us. (See *Graham v. Connor* (1989) 490 U.S. 386, 396–397 [104 L.Ed.2d 443, 109 S.Ct. 1865].)

So it is that we evaluate the propriety of their searches and seizures not by what they turn up, but by whether it was probable at the search's inception that it would develop evidence of a crime. (*People v. Hill* (1974) 12 Cal.3d 731, 748, fn. 16 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].) We judge their arrests not by a standard of certitude, but of "probable cause," which we define as an " 'honest and strong suspicion.' " (*People v. Harris* (1975) 15 Cal.3d 384, 388, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) And we require not even a probable cause level of likelihood to support the critical law enforcement tool of detention; for that we require only "reasonable suspicion." We demand only that there be "some objective manifestation that the person to be detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].)

This last is vitally important. Detention is almost certainly the most powerful tool we have provided the police. I am convinced it saves more lives and prevents more crime every day than search warrants, computers, handguns and helicopters combined. I am convinced its immense value is the only reason we give up that part of our precious freedom that is infringed by the admittedly unwelcome and unsettling experience of being confronted and questioned by an armed police officer, backed by the immense power of the state or federal government. I am convinced we must guard the liberties diminished by detention as zealously as we protect all the rest of our Fourth and Fifth Amendment rights. But I am also convinced all these considerations support the detention in this case, so I must respectfully dissent from my colleagues' decision to suppress the resultant evidence.

Detection and prevention of criminal activity is the cardinal function of our police. It is also the most difficult, dangerous, and constitutionally problematic. We are constantly called upon to balance the immeasurable value of effective law enforcement—to the individual citizen and to our society in general—against the precious individual rights that are the *raison d'être* of effective law enforcement. I think that balance here should have been struck in favor of law enforcement; I see no threat to individual rights in this detention, and I would deny defendant's motion to suppress and order the trial court to reinstate the charges against him.

The sole issue presented is the lawfulness of defendant's detention. "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza, supra*, 9 Cal.4th at p. 231.) "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (*In re Tony C.* (1988) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957].) Otherwise, the police would not have the necessary flexibility to investigate suspicious behavior. Confronted with a situation that is legally ambiguous, the police have every right " 'to resolve that . . . ambiguity and establish whether the activity is in fact legal or illegal . . . .' " (*Ibid.*) When they do investigate, and a detention results, the police should not be judged under rigid rules or held to the standard of "scientific certainty." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 125 [145 L.Ed.2d 570, 120 S.Ct. 673].) Rather, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." (*Ibid.*)

The inquiry is factually driven, of course, and we have learned over time that "[a]n area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under the

Fourth Amendment." (*People v. Souza, supra*, 9 Cal.4th at p. 240; see also *Illinois v. Wardlow, supra*, 528 U.S. at p. 124.) "[W]e must allow those ·we hire to maintain our peace as well as to apprehend criminals after the fact, to give appropriate consideration to their surroundings and to draw rational inferences therefrom, unless we are prepared to insist that·they cease to exercise their senses and their reasoning abilities the. moment they venture forth on patrol." (*People v. Holloway* (1985) 176 Cal.App.3d 150, 155 [221 Cal.Rptr. 394].) The detention here occurred in an area known to Officer Tisdale for gang activity, drug dealing and violent crime. It was a "high-crime area" by any definition of the term.

Moreover, the detention occurred late in the evening, about 11:30 p.m. This is another circumstance that lends support to the officer's actions. (See *People v. Souza, supra*, 9 Cal.4th at p. 241.) My concurring colleague devotes most of her opinion to distinguishing this case from *Souza*,[1] in part on the basis that *Souza* was a 3:00 a.m. detention and this one was conducted three and a half hours earlier, but as was noted in *People v. Rosenfeld* (1971) 16 Cal.App.3d 619, 622 [94 Cal.Rptr. 380], with regard to a 9:00 p.m. detention, "Notwithstanding defendant's claim that the hour of 9 p.m. is 'conventional,' it is night-time, and although 9 p.m. is a conventional hour it serves just as effectively to hide criminal activity as does 11 p.m. or 2 a.m."

The detention did not just occur in a high-crime area late at night, however. Officer Tisdale had specific information that there had been a rash of recent armed robberies at 7-Eleven stores in Anaheim. This logically fueled the officer's suspicions and added to the quantum of evidence in support of the detention. (See *U.S. v. Abokhai* (8th Cir. 1987) 829 F.2d 666 [prior armed robbery of Texaco station relevant in determining whether defendant was lawfully detained at another Texaco station]; *People v. Davis* (1968) 260 Cal.App.2d 186 [67 Cal.Rptr. 54] [prior burglaries in area added to suspicion of defendant's late-night presence at service station].)

So did the fact that defendant met the description of the person involved in the prior robberies. The 7-Eleven robber·was described as being a male Hispanic or African-American in his late 20's with a shaved head. According to respondent's brief, "Defendant is a 32 year-old Hispanic male with a 'buzz cut.'"[2] Granted, this description was general. But the fact defendant matched

---

[1] *Souza* is an instructive case, but I am not suggesting this detention should be upheld because it is the same as Souza's. It is not. No two cases are identical. And this detention must stand or fall not upon its resemblance to *Souza* but on its reasonableness.

[2] My concurring colleague questions my inclusion of this fact because "[t]he record does not reflect that the officer made observations at any time regarding Perrusquia's ethnicity or age." (Conc. opn., *ante*, at p. 235, fn. 1.) She is right that while the officer testified to Perrusquia's short hair, he offered no opinion that he "looked Hispanic." The record does, however, include

it is relevant insofar as it "included, rather than excluded" him as a suspect. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1093 [126 Cal.Rptr. 898].)

Other factors were also at play. When Officer Tisdale saw defendant's car, it was parked—with its motor running—in an odd location. Rather than taking one of the open spots close to the store, defendant chose to park his vehicle near the exit and facing the street, which would allow a would-be robber a quicker getaway. (See *U.S. v. Douglas* (1992) 964 F.2d 738 [that defendant parked in adjacent lot of apartment complex deemed suspicious when there was closer parking available to him].) It is true we have no sure way of knowing the condition of the parking lot when appellant arrived there; that is one of the things a detention would help resolve.

· Adding to Officer Tisdale's suspicions, defendant was "crouched low in the driver's seat" and "leaning against the glass." The officer watched him for some time and he made no move to go into the store, or leave, or turn off his engine. But as soon as the officer approached him, he fumbled about in his car and dropped something on the floor. Such furtive, nervous behavior, combined with the location and time of the encounter, and the cluster of 7-Eleven robberies would have put any reasonable person on heightened alert that criminal activity might be afoot. (See 4 LaFave, Search and Seizure (4th ed. 2004) § 9.5(f), p. 516, citing *U.S. v. Watson* (5th Cir. 1992) 953 F.2d 895, 897 [finding it suspicious that when officer approached his car, defendant moved in his seat "as if to conceal or retrieve some item"]; *U.S. v. Stanley* (1st Cir. 1990) 915 F.2d 54, 56 [suspicion increased where defendant "moved as though he were hiding something under the seat"].)

But that was not the end of it. When defendant spotted Officer Tisdale in his rearview mirror, he suddenly exited his vehicle and "quickly" and "aggressively" tried to avoid him. That was his right, of course, but it is an appropriate consideration in determining the legality of Officer Tisdale's actions. Such evasive conduct, although less incriminating than headlong flight (see, e.g., *Illinois v. Wardlow, supra,* 528 U.S. 119), is nevertheless suspicious in character. (See 4 LaFave, *supra,* pp. 516–521, citing *U.S. v. Lender* (4th Cir. 1993) 985 F.2d 151 [defendant attempted to evade officers

---

Perrusquia's trial and appellate attorneys' concessions that he was a young Hispanic male as part of the argument police should not be detaining every male African-American or Hispanic who frequents a 7-Eleven store—an irrebuttable position but one not strictly applicable to the facts of this case. While I would have preferred a finding on the record of Perrusquia's Hispanic heritage, I think his attorneys' candid concession obviates that. At any rate, I hardly consider this factor dispositive. It was merely one of many that called for a detention. The detention was not based upon race or ethnicity and does not require it to comply with the Fourth Amendment.

by turning his back on them and walking away]; *People v. Souza, supra,* 9 Cal.4th at p. 241 [suspects ducked down when officer shone spotlight toward their car].)

My concurring colleague is concerned that upholding this detention would send a confusing signal about consensual encounters. She asks, "[H]ow does one exercise one's right to decline a conversation with a police officer without assisting the officer in establishing reasonable suspicion?" (Conc. opn., *ante,* at p. 236.) This is an important concern. It is one I share. We cannot very well tell people they have a right not to cooperate with the police and then allow them to be detained if they exercise that "right."

But, of course, that is a false portrayal of the options here. No individual is obliged to talk to the police and if he chooses not to, his choice is insufficient to justify his detention. If his reluctance to cooperate with the police is the only thing "suspicious" about his conduct, he cannot be stopped. (See *Florida v. Royer* (1983) 460 U.S. 491, 498 [75 L.Ed.2d 229, 103 S.Ct. 1319] [citizen not required to talk to police; "He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, *without more,* furnish those grounds" (italics added)]; *Florida v. Bostick* (1991) 501 U.S. 429, 437 [115 L.Ed.2d 389, 111 S.Ct. 2382] ["a refusal to cooperate [with the police], *without more,* does not furnish the minimal level of objective justification needed for a detention" (italics added)].) That is clearly the law, and should be.

But if he is suspiciously parked, late at night, in the parking lot of a 7-Eleven store, in a high-crime area, with his engine running, and if there has been a rash of recent armed robberies of 7-Eleven stores in that area, and if those robberies took place late at night and were perpetrated by a young African-American or Hispanic individual, and if he is a young Hispanic, and if he shows no inclination to move from his car *until* police approach it and then tries to avoid them . . . *then* his decision to avoid them must, in any reasonable exercise of common sense, be considered in combination with all those other factors in judging the validity of his detention.

And when I consider all those factors, I conclude he can be legally detained because of them. He cannot be *arrested,* because that would require probable cause. But he can be detained for the short time it takes to find out if he has an innocent explanation of these facts or if he has—as in this case— two handguns and a very dubious plan for the evening.

Resolving the ambiguity my colleagues see in these circumstances is the whole point of detentions. And while detentions sometimes inconvenience innocent citizens, we allow them for the safety of the community and its police. I think the Fourth Amendment countenances that result. I think *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] countenanced it on facts certainly no stronger than these. And I think we should countenance it here.

Appellant's petition for review by the Supreme Court was denied July 25, 2007, S153207. Werdegar, J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.