Filed 9/25/20  P. v. Valenzuela CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>NICOLAS UBALDO VALENZUELA,<br><br>　　Defendant and Appellant. | H046675<br>(Monterey County<br>Super. Ct. No. SS170657A) |

## I.    INTRODUCTION

After the trial court denied his motion to suppress evidence (Pen. Code, § 1538.5,)[1] and motion to dismiss (§ 995), defendant Nicolas Ubaldo Valenzuela pleaded no contest to possession of a firearm by a felon (§ 29800, subd. (a)(1); count 1), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 2), misdemeanor possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 3), and misdemeanor resisting a police officer (§ 148, subd. (a)(1); count 4).  Defendant also admitted that he had a prior strike conviction (§ 1170.12, subd. (c)(2)).  The trial court sentenced defendant to two years.

Defendant contends that the evidence against him must be suppressed because he was unlawfully detained and searched.  The Attorney General counters that defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

"participated in a consensual encounter until the need for a pat search arose" and that the officers had a lawful basis to pat search defendant. (Emphasis and capitalization omitted.)

For reasons that we will explain, we determine that defendant was detained without reasonable suspicion that he was involved in criminal activity when the officers ordered him to submit to a pat search and took hold of him. Accordingly, we reverse the judgment.[2]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Preliminary Hearing Evidence*

The parties stipulated that the police did not have a warrant to search or arrest defendant.

### 1. Officer Testimony

On April 19, 2017 at about 9:42 p.m., Salinas Police Officers Peter Magallon and Jeffrey Alford were on patrol in a high-crime area known for gang activity. Homicides, robberies, shootings, assaults, and vehicle thefts had occurred there as well as a recent gang-related homicide. "[T]hree major gangs . . . reside[d] . . . in this area." Suspects in the neighborhood had been known to conceal firearms or narcotics in baggy clothing.

The officers observed defendant walking on the sidewalk. No one else was out walking and there was no traffic. There were no lights except for streetlights.

When the officers passed by in their marked patrol vehicle, defendant "paused" or "ducked down" behind a SUV. Defendant was slightly visible behind the vehicle. One of the officers suspected defendant "was either hiding, concealing something on his person, or trying to discard something," such as "[w]eapons[] [or] narcotics." It looked like defendant was trying to avoid the police. The officers decided to investigate based

---

[2] Because we reverse the judgment on the basis that defendant was unlawfully detained without a warrant, we do not address defendant's alternate claim that the concurrent sentence imposed on count 2 must be stayed under section 654.

on the nature of the neighborhood. Officer Alford said, " 'Let's stop and contact this guy.' "

Both officers exited the patrol vehicle and Officer Magallon contacted defendant on the sidewalk. Officer Alford stood behind defendant, taking a position of cover some distance away. Defendant was wearing baggy clothing and a baseball cap and "was kind of slumped over forward" or "bent over at the waistline," as if he was concealing something in his front waistband. Defendant's posture "wasn't normal." Officer Alford was concerned that defendant might have been armed based on his posture.

Initially, "[i]t was a casual conversation." Officer Magallon asked defendant if he lived in the area and what was " 'going on.' " Officer Magallon did not order defendant to stop, touch defendant, or draw a weapon. The patrol vehicle's headlights were on, but the overhead lights were not illuminated. Officer Magallon did not shine a flashlight in defendant's face.

Officer Magallon asked defendant for identification because he "wanted to know who [he] was talking to" and "if he was a wanted subject." It took a while for defendant to go through his wallet before he gave the officer two identification cards, one of which was expired. Defendant stated that the police had taken his driver's license or identification. Officer Magallon asked defendant several times whether he was on probation, and defendant responded that he was not. Officer Magallon suspected defendant may have been lying regarding his probation status because police do not seize driver's licenses or identification cards when no crime has been committed.

Officer Magallon noticed that defendant's right cheek had a tattoo of the "California bear with a star," which was consistent with the Northerners street gang. Officer Magallon asked defendant if it was a birthmark or a scar. Defendant responded that it was a work injury.

At that point, Officer Magallon decided it was necessary to pat search defendant for officer safety based on defendant's act of concealing himself behind a vehicle, the

3

dangerous neighborhood, the low lighting conditions, defendant's baggy clothing, defendant's statement that the police had seized his identification but he was not on probation, defendant's "lie[] about being in the gang" despite "[o]bvious ties that he was a gang member," and "the fact that he was slumped over, . . . possibly concealing something in his waistband." With Officer Alford standing approximately 10 feet behind defendant, Officer Magallon asked defendant for consent to search him. Defendant "would not consent."

Next, "Officer Alford grabbed [defendant's] arm and [defendant] pulled away." Defendant "actively resist[ed]" by moving and swinging his arms, causing Officer Alford to lose his footing and slip. Officer Alford regained his balance and took defendant to the ground. Defendant immediately placed his hands by his waistband, between the ground and his body. The officers told defendant to put his hands behind his back approximately 10 to 12 times, but defendant did not comply until Officer Alford told defendant he would use a taser on him.

Working together as defendant resisted, the officers handcuffed defendant. A search revealed a handgun in defendant's waistband with four rounds in the magazine. There was no round in the chamber. The gun was later determined to be stolen. Defendant also had a small amount of heroin in his front coin pocket. Officer Magallon ascertained that defendant was on probation but did not have a search condition.

### 2. Police Body Camera Footage

In addition to hearing the testimony of Officers Magallon and Alford, the magistrate reviewed footage from Officer Magallon's body camera that was admitted into evidence. The footage begins with Officer Magallon approaching defendant on the sidewalk. There is no audio recording for the first 31 seconds of the footage.

The body camera footage shows defendant approaching Officer Magallon on the sidewalk as Officer Magallon walks toward him. Defendant appears to be walking upright, not hunched over. Defendant stops in front of Officer Magallon, who briefly

4

shines his flashlight at the sidewalk over defendant's shoulder and at defendant's hands. The streetlights are on and there are lights on inside the home next to the sidewalk, but it is dark outside. The footage shows defendant conversing with Officer Magallon as Officer Alford, in uniform, slowly approaches defendant from behind while also searching the sidewalk area with his flashlight. Defendant shakes his head at one point, shrugs, and gestures to an area outside the camera's view. During this time, Officer Magallon begins to shine his flashlight at defendant's midsection. Defendant retrieves his wallet from a rear pants pocket approximately 15 seconds after he starts talking to the officer.

The audio of the body camera footage begins as defendant starts to look through his wallet. Defendant is still standing upright. Defendant states that he is not on probation and says, "I'm not nothing." Officer Magallon responds, "All right. Just didn't know who you were. That's it, man." Defendant expresses that he does not know why he was stopped and adds, "I'm not doin' anything." Officer Magallon responds, "Just wanna check ya out. See what's up, man." Defendant states, "All right," and the officer continues, "That's it. You have nothin' to hide, right?" Defendant responds, "Nah. You guys are always doing this to me, man."

Defendant steps forward and bends over into the light from Officer Magallon's flashlight as defendant continues to search through his wallet. Defendant, hunched over into the light, hands one identification card to the officer and keeps looking through his wallet. Officer Magallon mentions that defendant's identification is four years old. About 20 seconds later, defendant hands the officer another identification card and immediately straightens back up, while stating that "you guys are always pulling me over for nothing." Defendant mentions that another officer kept his license. Officer Magallon hands one of the identification cards back to defendant and asks defendant about the status of his license. Defendant responds that "[i]t's good" and that he guessed the other officer forgot to give his license back to him.

5

The body camera footage shows Officer Magallon gesture toward his own face while asking defendant if he has a mole or a birthmark. Defendant responds that he cut himself at work and that he is an electrician. Officer Magallon shines his flashlight in defendant's face for about three to four seconds and asks, "Oh, it's a tattoo?" Defendant replies, "Yeah, it's a tattoo," but again states that he is an electrician, adding that he cut himself "with a grinder." Defendant briefly shows the officer a laminated card and makes more statements about the injury. Defendant then says that he "live[s] right here." Defendant again states that the police "always pull [him] over."

A little over two minutes into the video footage, defendant turns his head away from Officer Magallon, appearing to look at someone approaching him. Officer Alford asks defendant if he has any weapons on him and defendant responds, "Nah." Officer Alford asks, "Let me pat you down, okay?" Defendant responds, "I mean, I don't have nothing." Officer Alford comes into view and touches defendant's arm. Defendant swings his arm away and repeatedly states, "I'm not on nothing." As defendant tries to back away, Officer Alford tells defendant, "You're gonna get patted down." Officer Alford grabs defendant's arm as defendant repeatedly states, "I'm not on nothing."

Defendant attempts to run away as Officer Alford holds onto him. Officer Alford brings defendant to the ground. Once on the ground, defendant's arms and hands are initially under his chest and upper body. Officers Magallon and Alford repeatedly tell defendant to relax and to show them his hands. Defendant, in a raised voice, exclaims, "I'm not on anything," and, "I'm not on probation[!]" Defendant keeps his hands underneath him, but the footage does not show at this point where defendant's hands are located underneath his body. Officer Alford, now on top of defendant, tells defendant, "Give me your hand, dude. Give me your hand . . . or you're gonna get Tased. You're gonna get Tased." Defendant states, "I ain't even doing anything. I'm not on probation or nothing."

Approximately three minutes into the body camera footage, the officers take hold of defendant's arms and handcuff defendant behind his back. Officer Alford helps defendant up. Defendant is asked if he has any weapons on him and responds, "No." A little over four minutes into the video footage, Officer Alford states, "He's got a gun in his waistband, I think." Officer Magallon reacts, "Serious[ly], man? I asked you, man, for my safety, dude." Defendant responds, "Yeah, I know, but I'm not doing nothing illegal standing right here." Officer Alford then indicates that he has possession of the gun. Defendant is brought to a patrol vehicle and searched. Defendant is placed in the patrol vehicle six minutes and 30 seconds after the video footage began.

## B.     *Motion to Suppress*

Defendant filed a motion to suppress evidence (§ 1538.5), asserting that the prosecution had the burden to justify the search (see *People v. Williams* (1999) 20 Cal.4th 119, 130). The prosecution filed written opposition, arguing that the initial contact between the officers and defendant was consensual, the officers had a lawful basis to pat search defendant based on their reasonable suspicion that he was armed and dangerous, and the subsequent search of defendant occurred incident to defendant's arrest for resisting a police officer. Defendant filed a response to the prosecution's opposition, arguing that the body camera footage established that defendant was detained without a lawful basis when the officers encountered him on the sidewalk and that his refusal to cooperate did not justify a detention. Defendant also filed supplemental briefing after the evidentiary hearing, asserting that he was detained without reasonable suspicion when Officers Magallon and Alford confronted him and that "[n]othing in the record indicates that [the] officers reasonably suspected [he] was about to commit a crime."

At the motion to suppress hearing, defendant argued that he was detained when the officers contacted him because a reasonable person would not have felt free to leave. The prosecution asserted that the encounter was consensual based on the fact that only two officers were involved, neither officer drew or referenced his weapon, neither officer

7

touched defendant until the pat search, and Officer Magallon's tone of voice and language were casual. The prosecution further claimed that the pat search was lawfully necessitated by "an officer safety concern" based on defendant's posture, which indicated to the officers that defendant was hiding something in his waistband, and the fact that defendant lied about his gang tattoo. The prosecution concluded that the officers did not violate the Fourth Amendment, asserting, "It was a consensual contact that eventually turned into a detention and an arrest based on the defendant's own behavior."

The magistrate ruled that under the totality of the circumstances, the officer's initial contact with defendant was lawful because "any reasonable person would see that this was a consensual contact that could end." The magistrate observed that the officers did not shine the patrol car's lights on defendant, turn on the light bar, or activate the siren. The officers did not block defendant with their vehicle, order defendant to stop, demand to speak to defendant, shine a flashlight in defendant's face, or make physical contact with him. The magistrate found that the officer's request for defendant's identification did not turn the consensual encounter into a detention and that less than a minute or two into the conversation, a second officer took a position of cover, which also "d[id] not change the overall nature of the contact." The magistrate noted that "defendant's attempts to mislead the officer about an obvious gang tattoo" gave the officers "more cause for concern." The magistrate determined that the contact occurred in a high-crime area with a history of gang activity, defendant attempted to mislead the officers about his gang tattoo, defendant wore baggy clothing and slumped at the waist, and the lighting was low, all of which would have "tend[ed] to indicate to any trained officer that the defendant is trying to hide something." The magistrate found that within two to three minutes of the initial contact, the officers informed defendant he would be pat searched and that "[d]efendant immediately and forcefully trie[d] to resist the pat-down and [was] taken to the ground." The magistrate concluded that "[t]he officers did not violate the defendant's rights" and denied the motion to suppress.

8

## C.  *Information and Motion to Dismiss*

An information was filed charging defendant with possession of a firearm by a felon (§ 29800, subd. (a)(1); count 1), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 2), misdemeanor possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 3), and misdemeanor resisting a police officer (§ 148, subd. (a)(1); count 4).  The information also alleged that defendant had a prior strike conviction (§ 1170.12, subd. (c)(2)).

Defendant moved to dismiss the charges, asserting that the magistrate erred in denying the motion to suppress.  (§§ 995, 1538.5, subd. (i).)  The trial court denied the motion, finding "there was reasonable suspicion to detain based on the totality of the circumstances at the point where the consensual contact became a detention" and that there was later "probable cause to arrest."

## D.  *Pleas and Sentencing*

Defendant pleaded no contest to the charges and admitted the strike allegation.

The trial court sentenced defendant to two years in prison on count 1, two years concurrent on count 2, and concurrent terms of 364 days each on counts 3 and 4.

## III.    DISCUSSION

Defendant contends that the evidence against him must be suppressed because he was illegally detained and searched.  Defendant argues that he was unlawfully detained when the officers contacted him because a reasonable person would not have felt free to leave and the officers did not have a reasonable suspicion that defendant was involved in criminal activity.  Defendant asserts that he was detained when first contacted by the officers, he was "further detained" when Officer Magallon took his identification cards, and he was "manifestly" detained when Officer Alford grabbed his arm after he refused permission to search.  Defendant also contends that the pat search was unlawful because it was not supported by specific, articulable facts that would lead a reasonable officer to believe defendant was armed and dangerous.

9

The Attorney General counters that the contact between the officers and defendant was initially consensual because the officers did not reach for or reference their weapons, shine their flashlights in defendant's face, touch defendant, or use forceful language. The Attorney General argues that "[u]nder the totality of the circumstances . . . , during the course of a consensual contact, the officers drew a reasonable inference that appellant was armed and they acted accordingly." The Attorney General asserts that "[i]n the context of the dark, deserted, and disreputable neighborhood, [defendant's] physical tells and inclination to lie turned his consensual encounter into a pat search justified by the totality of the circumstances."

### A.    *Legal Principles*

"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are 'unreasonable.' (*Terry v. Ohio* (1968) 392 U.S. 1, 19 & fn. 16; [citation].) Our state Constitution has a similar provision. (Cal. Const., art. I, § 13.)" (*People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*).)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) "Unlike detentions, [consensual encounters] require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]" (*Ibid.*) "Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*Ibid.*)

When a police contact rises to the level of a detention, the detention is "reasonable under the Fourth Amendment [if] the detaining officer can point to specific articulable

10

facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza*, *supra*, 9 Cal.4th at p. 231.) "The officer's . . . suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

## B. Standard of Review

"Defendant, as the moving party, had the initial burden of proving a warrantless search or seizure occurred. [Citation.] There was no warrant in this case, so the burden shifted to the prosecution to show any warrantless searches or seizures were justified under the Fourth Amendment to the United States Constitution. [Citation.] '[T]he controlling burden of proof at suppression hearings . . . [is] proof by a preponderance of the evidence.' [Citation.]" (*People v. Flores* (2019) 38 Cal.App.5th 617, 626.)

In ruling on a motion to suppress, the magistrate "must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

On appeal from a section 995 review of the denial of a defendant's motion to suppress, we disregard the ruling of the superior court and directly review the determination of the magistrate. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718, superseded by statute on other grounds as stated in *People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223 (*Trujillo*).)

11

**C.    *Analysis***

It is well established that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." (*United States v. Drayton* (2002) 536 U.S. 194, 200.)  However, as we stated above, when officers engage in a detention, the officers must have "specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza*, *supra*, 9 Cal.4th at p. 231.)  We determine that defendant was detained when the officers ordered him to submit to a pat search and took hold of him, and conclude that the detention was unlawful because there was no reasonable suspicion that defendant was involved in criminal activity.[3]

"A seizure occurs whenever a police officer 'by means of physical force or show of authority' restrains the liberty of a person to walk away." (*Souza*, *supra*, 9 Cal.4th at p. 229.)  While an officer may request consent to search, "if the manner in which the request was made constituted a show of authority such that [the person] reasonably might believe he [or she] had to comply, then the encounter was transformed into a detention." (*People v. Franklin* (1987) 192 Cal.App.3d 935, 941.)

Defendant was unquestionably detained once the officers ordered him to submit to a pat search and took hold of him.  The officers' testimony and the body camera footage establish that during the officers' contact with defendant, an officer asked, "Let me pat you down, okay?"  Defendant responded, "I don't have nothing," and began to back away.  Defendant "would not consent."  Officer Alford immediately told defendant,

---

[3] Because we conclude that defendant was unlawfully detained when the officers stopped him to perform a pat search, we do not address whether the officers' initial contact with defendant was consensual.

"You're gonna get patted down," and grabbed defendant's arm, thereby detaining him. (See *Souza*, *supra*, 9 Cal.4th at p. 229.)

Importantly, "[b]ecause the 'intrusion upon the sanctity of the person' consists not only of the patdown itself but also of the temporary detention during which the patdown occurs, to justify frisking or patting down a person during an on-the-street stop, 'the officer must *first have constitutional grounds to insist on an encounter*, to make a *forcible* stop.' [Citation.]" (*Souza*, *supra*, 9 Cal.4th at p. 229, first italics added, second italics in original, quoting *Terry v. Ohio* (1968) 392 U.S. 1, 32 (*Terry*) (conc. opn. of Harlan, J.); see also *Terry*, *supra*, at p. 30 [an officer may conduct a pat search when he or she "observes unusual conduct which leads him [or her] reasonably to conclude in light of his [or her] experience that *criminal activity may be afoot and* that the persons with whom he [or she] is dealing may be armed and presently dangerous" (italics added)]; *Adams v. Williams* (1972) 407 U.S. 143, 146, fn. omitted [an officer may frisk a person for weapons "[s]o long as the officer is entitled to make a forcible stop"]; *Florida v. Royer* (1983) 460 U.S. 491, 498 [observing that under *Terry*, "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime," thus rendering "a stop and a frisk for weapons . . . unexceptionable"]; *People v. Celis* (2004) 33 Cal.4th 667, 674 [police may " 'stop and . . . frisk for weapons' when they have an 'articulable suspicion [the] person has committed or is about to commit a crime' "].) Absent reasonable suspicion to detain, "police[ officers] have no more right to 'pat down' the outer clothing of passers-by, or of persons to whom they address casual questions, than does any other citizen." (*Terry*, *supra*, at p. 32 (conc. opn. of Harlan, J.).)

Grounds for a lawful detention arise when, based on the totality of the circumstances, "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." (*United States v. Cortez* (1981) 449 U.S. 411, 417-418.) In other words, a detention is valid if "the circumstances

13

known or apparent to the officer . . . include specific and articulable facts . . . that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he [or she] intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 (*Tony C.*), superseded by statute on another ground as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733 (*Lloyd*).)[4]  However, " 'no stop or detention is permissible when the circumstances are not reasonably "consistent with criminal activity" and the investigation is therefore based on mere curiosity, rumor, or hunch.' " (*People v. Loewen* (1983) 35 Cal.3d 117, 129 (*Loewen*).)

We recognize that "[t]he reasonableness of a stop turns on the facts and circumstances of each case." (*United States v. Mendenhall* (1980) 446 U.S. 544, 561 (conc. opn. of Powell, J.).)  We find *People v. Leyba* (1981) 29 Cal.3d 591 (*Leyba*), superseded by statute on other grounds as stated in *Trujillo*, *supra*, 217 Cal.App.3d at p. 1223, and *Souza*, *supra*, 9 Cal.4th 224, where the California Supreme Court upheld the detentions, and *People v. Perrusquia* (2007) 150 Cal.App.4th 228 (*Perrusquia*), where the Court of Appeal found the stop unlawful, instructive here.

In *Leyba*, an officer observed a car's headlights blink on and off several times as the car drove past a school parking lot at 11:30 p.m.  (*Leyba*, *supra*, 29 Cal.3d at p. 598.)  The officer then saw the headlights of a vehicle parked on the school lot blink on and off before the car exited the lot and appeared to follow the other car.  (*Ibid.*)  The officer stopped one of the vehicles, and the defendant got out of the car and threw 10 to 12 bindles of phencyclidine to the ground as he tried to walk away.  (*Id.* at p. 596.)  At the suppression hearing on the challenged car stop, the officer "testified that the school and surrounding area were part of his regular patrol area; that no classes or other

---

[4] "[F]ollowing the enactment of Proposition 8 . . . , the prosecution no longer has the burden of showing a police officer *actually* suspected the individual detained was involved in criminal activity.  Rather, the focus is on whether the officer's conduct was objectively reasonable." (*Lloyd*, *supra*, 4 Cal.App.4th at p. 733, fn. omitted.)

14

activities were being conducted and it was unusual for anyone to be on the school premises at that hour; that the area experiences a substantial amount of Mexican gang related activity and a substantial number of school burglaries (although he had no knowledge of any at that particular school).  He formed the opinion that criminal activity had occurred or was about to occur through an intertwining of his observations and his knowledge of the area.  The flashing of headlights represented signalling, possibly indicating an awareness of the presence of the officers.  While he was not sure of the exact nature of the activity, 'a strong possibility existed that a school burglary had taken place.' "  (*Id.* at p. 599.)

The California Supreme Court determined that the officer's suspicion of criminal activity was objectively reasonable based on "[t]he lateness of the hour; the blinking of headlights by the two cars, one parked in a closed school, so as to indicate signalling; [and] the following of one by the other," given the officer's "training and experience, and his knowledge of ongoing gang activity and the occurrence of a number of school burglaries in the area."  (*Leyba*, *supra*, 29 Cal.3d at p. 600.)  The court reaffirmed that " '[the] possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct.  Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal -- to "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.  [Citation.]" ' " (*Id.* at p. 599.)

In *Souza*, at 3 o'clock in the morning "in the exact area where [the officer] had recently made two arrests, including one for burglary," the officer observed "[the] defendant and his companion . . . standing in almost total darkness on a sidewalk next to a car parked in a residential area."  (*Souza*, *supra*, 9 Cal.4th at pp. 228, 241.)  When the officer shone his spotlight at the car, "two people in the front seat . . . bent down toward the floorboard, and defendant took off running."  (*Id.* at p. 228.)  The California Supreme

15

Court determined that "[t]hese evasive actions added support to the officer's suspicion that criminal activity was afoot, and that defendant was involved in that activity," and "justified a brief, investigative detention to enable the officer to resolve the ambiguity in the situation and to find out whether the activity was in fact legal or illegal." (*Id.* at pp. 241 & 242.)

In *Perrusquia*, an officer was on patrol in a high-crime area with gang activity near a 7-Eleven where six armed robberies had recently occurred. (*Perrusquia*, *supra*, 150 Cal.App.4th at pp. 230-231, 233.) At 11:26 p.m., the officer noticed a car parked in the store's lot away from the entrance with its engine idling and the defendant "crouched low in the driver's seat." (*Id.* at p. 231.) The officer heard a fumbling sound and "something dropping to the floor of the car with a 'thud' " as he approached. (*Ibid.*) The defendant, wearing baggy clothing, exited the vehicle and " 'quickly' " and " 'aggressively' " tried to pass the officer. (*Ibid.*) When asked what was going on, the defendant responded he was going into the store. (*Ibid.*) The officer requested identification, and the defendant appeared agitated but retrieved his identification from the car. (*Ibid.*) The officer asked the defendant if he could pat search him for weapons, and the defendant responded no and began to walk away, but not in the direction of the store or his car. (*Ibid.*) The officer, along with another officer who had been standing by, took hold of the defendant's arms and wrists and, touching the defendant's waist, found a gun in the waistband. (*Id.* at pp. 231-232.) Once handcuffed, defendant admitted he had another gun in his waistband. (*Id.* at p. 232.) Methamphetamine and a pipe were found in one of the defendant's pockets. (*Ibid.*)

The Court of Appeal affirmed the magistrate's decision granting the suppression motion. (*Perrusquia*, *supra*, 150 Cal.App.4th at pp. 232, 235.) The court observed that many of the facts forming the basis for the stop were unrelated to the defendant, such as the location, and that "[r]easonable suspicion . . . cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area." (*Id.* at p. 233.) The

16

court held that the remaining facts—the defendant's car running and parked near an exit, the " 'thud' " heard by the officer as he approached the car, and the defendant's attempt to avoid the police—"failed to show 'specific facts from which an ordinary person would believe that a crime has been or is about to be committed,' " even given the string of recent robberies at the 7-Eleven.[5] (*Id.* at pp. 231, 234; see *id.* at p. 234 [also noting that it was not particularly late and that "[t]he officers permitted [the] defendant to retrieve his identification from his car, which is some indication they did not associate the thud they heard with danger"].) The court determined that rather than reasonable suspicion, "[t]he officer . . . had a hunch that something was amiss with defendant, and he turned out to be right. That he was right, however, cannot be used to retroactively justify a detention." (*Id.* at p. 234.)

In the case before us, the magistrate impliedly determined that defendant's detention was reasonable, ruling that when the officers informed defendant he would be pat searched, "[d]efendant immediately and forcefully trie[d] to resist the pat-down and [was] taken to the ground," and "[t]he officers did not violate the defendant's rights." The magistrate found that defendant tried to avoid the officers before they contacted him "by either slowing down, stopping, or not proceeding [past] the car or vehicle blocking the[] [officers'] view of him," the encounter occurred in a poorly lit, high-crime area with a history of gang activity, and defendant, wearing baggy clothing and slumped at the waist, attempted to mislead the officers about his gang tattoo.[6]

The fact that the detention occurred in a poorly lit, high-crime area with gang activity does not, on its own, justify the stop. (See *Illinois v. Wardlow* (2000) 528 U.S.

---

[5] Because the prosecution in *Perrusquia* conceded that a stop occurred when the officer asked the defendant to " 'hang on a second,' " the Court of Appeal did not consider factors arising after the officer's request. (*Perrusquia*, *supra*, 150 Cal.App.4th at p. 234.)

[6] The body camera footage does not show defendant's conduct before Officer Magallon approached him on the sidewalk.

119, 124; *Perrusquia*, *supra*, 150 Cal.App.4th at p. 233.) The circumstances particular to defendant here include his attempt to avoid the police by slowing down when they drove by, which led one of the officers to suspect that defendant "was either hiding, concealing something on his person, or trying to discard something," such as "[w]eapons[] [or] narcotics." However, avoidance of contact initiated by the police is not necessarily unusual behavior. (See *Souza*, 9 Cal.4th at p. 234 ["an individual is free to avoid contact with a police officer," although "the *manner* in which a person avoids police contact" may be considered in assessing reasonable suspicion]; see also *People v. Bower* (1979) 24 Cal.3d 638, 647 [noting "the problems inherent in attempting to infer criminal activity from allegedly 'furtive' behavior"].) Unlike in *Souza*, defendant did not "t[ake] off running." (*Souza*, *supra*, at p. 240.) When the police body camera footage begins, defendant can be seen walking down the sidewalk toward the officer.

At 9:42 p.m., it was not particularly late for defendant to be out walking in a residential neighborhood, especially given his statement that he "live[d] right here." (Cf. *Souza*, *supra*, 9 Cal.4th at p. 241 [three a.m. is " 'a late and an unusual hour for anyone to be in attendance at an outdoor social gathering' "]; *Leyba*, *supra*, 29 Cal.3d at p. 600 [involving possible signaling behavior at a late hour in a closed school's parking lot].) While the officers could certainly consider defendant's slumped posture, baggy clothing, and failure to admit he had a tattoo,[7] " 'no stop or detention is permissible when the circumstances are not reasonably "consistent with criminal activity." ' " (*Loewen*, *supra*, 35 Cal.3d at p. 129.) Finally, we observe that the officers allowed defendant to reach into his back pocket to retrieve his identification after they had already seen defendant's slouched stance and attempt to avoid them, which is some indication they

_____

[7] When asked whether he had a mole or birthmark on his face, defendant initially stated that he had cut himself at work. When the officer asked defendant directly whether he had a tattoo on his face, defendant said yes and reiterated that he had cut himself at work.

did not associate defendant's conduct with danger or criminal activity. (See *Perrusquia*, *supra*, 150 Cal.App.4th at p. 234.)

Taken together, the facts found by the magistrate establish that defendant tried to avoid the police and mislead the officers about his tattoo while walking in a high-crime, poorly lit residential neighborhood wearing baggy clothing and slouching—conduct that is unlike that in *Leyba*, with seeming signaling behavior occurring in a closed school's parking lot late at night, *Souza*, involving a late, outdoor social gathering in total darkness and flight at the officer's approach, and even *Perrusquia*, with at least some behavior arguably consistent with casing a store prone to armed robberies. (See *Leyba*, *supra*, 29 Cal.3d at p. 600; *Souza*, *supra*, 9 Cal.4th at pp. 228, 240; *Perrusquia*, *supra*, 150 Cal.App.4th at p. 231.) We conclude these facts fail to reasonably show "(1) some activity relating to crime has taken place or is occurring or about to occur, and (2) [defendant] [was] involved in that activity." (*Tony C.*, *supra*, 21 Cal.3d at p. 893.) Rather, the officers, undoubtedly in good faith and based on their training and experience, decided to investigate and turned out to be right. (See *Loewen*, *supra*, 35 Cal.3d at p. 129; *Perrusquia*, *supra*, at p. 234.) To lawfully detain someone, however, the officers must be able to "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza*, *supra*, at p. 231.) We determine the record lacks "specific articulable facts that . . . provide some objective manifestation" that defendant may have been involved in criminal activity when he was stopped. (*Ibid.*)

Accordingly, because the facts found by the magistrate do not establish that the officers *first* entertained a reasonable suspicion that defendant was involved in criminal activity when they detained him to perform a pat search, we determine that the detention was unlawful (see *Souza*, *supra*, 9 Cal.4th at p. 229) and that the magistrate erred in denying defendant's motion to suppress.

19

## IV.   DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to permit defendant to withdraw his no contest plea, to vacate its order denying the motion to suppress, and to enter a new order granting the motion to suppress.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
PREMO, ACTING P.J.

_____
ELIA, J.

***People v. Valenzuela***
**H046675**